# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DONALD CHAIRES, GEORGE DENAULT, JANE DOE, JOHN DOE, BRITTANY GILLELAND, GERALD GIRARD, SARA HASSELBACH, LINDSEY KINHAN, JOSEPH MCLAUGHLIN, MATTHEW TEACHMAN, and KARYN WOFFORD, | No. 1:17-cv-10158 |
| Plaintiffs, | |
| v. | **DEMAND FOR JURY TRIAL** |
| SANOFI U.S., NOVO NORDISK INC., and ELI LILLY AND COMPANY, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     PARTIES ..............................................................................................................9

        A.      Plaintiffs..................................................................................................9

        B.      Defendants ............................................................................................13

III.    JURISDICTION AND VENUE .........................................................................14

IV.     DRUG PRICING IN THE UNITED STATES....................................................15

        A.      The Entities Involved in Drug Pricing .................................................15

        B.      The Drug Payment & Distribution Structure .......................................17

        C.      Different Prices for Different Players ...................................................19

        D.      Consumer Drug Costs ...........................................................................20

        E.      Manipulation of Cost-Saving Incentives:  Drug Benchmark Price
                Competition and the Secret Rebates to PBMs ......................................27

V.      LONG-ACTING INSULIN ANALOGS .............................................................30

        A.      Diabetes:  The Disease and Demographics...........................................30

        B.      The Origins of Insulin Treatment .........................................................32

        C.      Current Insulin Treatment Landscape...................................................35

        D.      Climbing Insulin Prices Unrelated to Any Rise in Production Costs ...................38

        E.      Collusive Competition:  The Real Reason for Sanofi and Novo Nordisk's
                Increasing Benchmark Prices.................................................................42

        F.      The Economic Effect of Sanofi, Novo Nordisk, and Eli Lilly's Price
                Increases on Patients .............................................................................49

        G.      The Real Impact of Artificial Pricing ...................................................51

VI.     TOLLING OF THE STATUTE OF LIMITATIONS...........................................54

        A.      Discovery Rule Tolling..........................................................................54

B.      Fraudulent Concealment Tolling ........................................................54

C.      Estoppel.............................................................................................55

VII.     CLASS ACTION ALLEGATIONS .................................................................55

VIII.    CLAIMS FOR RELIEF ...................................................................................59

COUNT ONE  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.* ...................59

A.      The Lantus Pricing Enterprise ...........................................................59

B.      Conduct of the Lantus Pricing Enterprise ..........................................65

C.      Sanofi's Pattern of Racketeering Activity ...........................................67

D.      Sanofi's Use of the U.S. Mail and Interstate Wire Facilities................68

E.      Damages Caused by Sanofi's Lantus Pricing Fraud.............................71

COUNT TWO  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.* ...................73

A.      The Levemir/Novolog Pricing Enterprise...........................................73

B.      Conduct of the Levemir/Novolog Pricing Enterprise ...........................79

C.      Novo Nordisk's Pattern of Racketeering Activity .................................81

D.      Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities ...................83

E.      Damages Caused by Novo Nordisk's Levemir and Novolog Pricing Fraud.........85

COUNT THREE  VIOLATION OF THE RACKETEER INFLUENCED AND
CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.* ................87

A.      The Humalog Pricing Enterprise ........................................................88

B.      Conduct of the Humalog Pricing Enterprise.......................................93

C.      Eli Lilly's Pattern of Racketeering Activity .........................................95

D.      Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities............97

E.      Damages Caused by Eli Lilly's Humalog Pricing Fraud......................99

COUNT FOUR  VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
AGAINST SANOFI (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*) ........................101

- ii -

COUNT FIVE  VIOLATION OF THE NEW JERSEY  CONSUMER FRAUD ACT AGAINST NOVO NORDISK  (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*) ........................105

COUNT SIX  VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT  (ALA. CODE § 8-19-1, *ET SEQ.*) ........................................109

COUNT SEVEN  VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT  (ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*) ...............................................................................110

COUNT EIGHT  VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT (ARIZONA REV. STAT. § 44-1521, *ET SEQ.*)...............................111

COUNT NINE  VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT  (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)....................................112

COUNT TEN  VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT  (CAL. CIV. CODE § 1750, *ET SEQ.*) .................................................113

COUNT ELEVEN  VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW  (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)................................115

COUNT TWELVE  VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT  (COLO. REV. STAT. § 6-1-101, *ET SEQ.*) ...........................116

COUNT THIRTEEN  VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT  (CONN. GEN. STAT. § 42-110A, *ET SEQ.*).................................117

COUNT FOURTEEN  VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT  (DEL. CODE TIT. 6, § 2513, *ET SEQ.*)...................................118

COUNT FIFTEEN  VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT  (D.C. CODE § 28-3901, *ET SEQ.*) .............................119

COUNT SIXTEEN  VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT  (FLA. STAT. § 501.201, *ET SEQ.*) ...................120

COUNT SEVENTEEN  VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT  (GA. CODE ANN. § 10-1-390, *ET SEQ.*) .....................121

COUNT EIGHTEEN  VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT  (GA. CODE. ANN § 10-1-370, *ET SEQ.*)........................122

COUNT NINETEEN  VIOLATION OF THE HAWAII ACT § 480-2(A)  (HAW. REV. STAT. § 480, *ET SEQ.*) ..................................................122

COUNT TWENTY  VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT (IDAHO CODE ANN. § 48-601, *ET SEQ.*) ...................................123

COUNT TWENTY-ONE  VIOLATION OF THE ILLINOIS CONSUMER FRAUD
AND DECEPTIVE BUSINESS PRACTICES ACT  (815 ILL. COMP. STAT. §
505/1, *ET SEQ.* AND 720 ILL. COMP. STAT. § 295/1A)..............................................124

COUNT TWENTY-TWO  VIOLATION OF THE INDIANA DECEPTIVE
CONSUMER SALES ACT  (IND. CODE § 24-5-0.5-3) ................................................125

COUNT TWENTY-THREE  VIOLATION OF THE IOWA PRIVATE RIGHT OF
ACTION FOR CONSUMER FRAUDS ACT  (IOWA CODE § 714H.1, *ET
SEQ.*)........................................................................................................................127

COUNT TWENTY-FOUR  VIOLATION OF THE KANSAS CONSUMER
PROTECTION ACT  (KAN. STAT. ANN. § 50-623, *ET SEQ.*) ...................................128

COUNT TWENTY-FIVE  VIOLATION OF THE KENTUCKY CONSUMER
PROTECTION ACT  (KY. REV. STAT. ANN. § 367.110, *ET SEQ.*)...........................129

COUNT TWENTY-SIX  VIOLATION OF THE LOUISIANA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION LAW  (LA. REV. STAT.
ANN. § 51:1401, *ET SEQ.*) .......................................................................................130

COUNT TWENTY-SEVEN  VIOLATION OF THE MAINE UNFAIR TRADE
PRACTICES ACT  (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ.*) ...................131

COUNT TWENTY-EIGHT  VIOLATION OF THE MARYLAND CONSUMER
PROTECTION ACT  (MD. CODE, COM. LAW § 13-101, *ET SEQ.*) ..........................132

COUNT TWENTY-NINE  VIOLATION OF THE MASSACHUSETTS GENERAL
LAW CHAPTER 93(A)  (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*) ....................132

COUNT THIRTY  VIOLATION OF THE MICHIGAN CONSUMER PROTECTION
ACT  (MICH. COMP. LAWS § 445.903, *ET SEQ.*)........................................................134

COUNT THIRTY-ONE  VIOLATION OF THE MINNESOTA PREVENTION OF
CONSUMER FRAUD ACT  (MINN. STAT. § 325F.68, *ET SEQ.*) ..............................135

COUNT THIRTY-TWO  VIOLATION OF THE MINNESOTA DECEPTIVE TRADE
PRACTICES ACT  (MINN. STAT. § 325D.43-48, *ET SEQ.*) .......................................136

COUNT THIRTY-THREE  VIOLATION OF THE MISSISSIPPI CONSUMER
PROTECTION ACT  (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*) ................................137

COUNT THIRTY-FOUR  VIOLATION OF THE MISSOURI MERCHANDISING
PRACTICES ACT  (MO. REV. STAT. § 407.010, *ET SEQ.*)........................................137

COUNT THIRTY-FIVE  VIOLATION OF THE MONTANA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT OF 1973  (MONT.
CODE ANN. § 30-14-101, *ET SEQ.*).............................................................................138

COUNT THIRTY-SIX  VIOLATION OF THE NEBRASKA CONSUMER
PROTECTION ACT  (NEB. REV. STAT. § 59-1601, *ET SEQ.*)..................................139

COUNT THIRTY-SEVEN  VIOLATION OF THE NEVADA DECEPTIVE TRADE
PRACTICES ACT  (NEV. REV. STAT. § 598.0903, *ET SEQ.*) ....................................140

COUNT THIRTY-EIGHT  VIOLATION OF THE NEW HAMPSHIRE  CONSUMER
PROTECTION ACT  (N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*) ........................141

COUNT THIRTY-NINE  VIOLATION OF THE NEW JERSEY CONSUMER FRAUD
ACT  (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*) ...................................................142

COUNT FORTY  VIOLATION OF THE NEW MEXICO UNFAIR TRADE
PRACTICES ACT  (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*)....................................143

COUNT FORTY-ONE  VIOLATION OF THE NEW YORK GENERAL BUSINESS
LAW §§ 349-350  (N.Y. GEN. BUS. LAW §§ 349-350) ................................144

COUNT FORTY-TWO  VIOLATION OF THE NORTH CAROLINA UNFAIR AND
DECEPTIVE ACTS  AND PRACTICES ACT  (N.C. GEN. STAT. § 75-1.1, *ET
SEQ.*)......................................................................................................145

COUNT FORTY-THREE  VIOLATION OF THE NORTH DAKOTA CONSUMER
FRAUD ACT  (N.D. CENT. CODE § 51-15-02)............................................145

COUNT FORTY-FOUR  VIOLATION OF THE OHIO CONSUMER SALES
PRACTICES ACT  (OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)...........................146

COUNT FORTY-FIVE  VIOLATION OF THE OKLAHOMA CONSUMER
PROTECTION ACT  (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)..................................147

COUNT FORTY-SIX  VIOLATION OF THE OREGON UNLAWFUL TRADE
PRACTICES ACT  (OR. REV. STAT. §§ 646.605, *ET SEQ.*).......................................149

COUNT FORTY-SEVEN  VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION LAW  (73 PA. CONS. STAT.
§ 201-1, *ET SEQ.*)...........................................................................................150

COUNT FORTY-EIGHT  VIOLATION OF THE RHODE ISLAND UNFAIR TRADE
PRACTICES  AND CONSUMER PROTECTION ACT  (R.I. GEN. LAWS § 6-
13.1, *ET SEQ.*) ...............................................................................................151

COUNT FORTY-NINE  VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE
PRACTICES ACT  (S.C. CODE ANN. § 39-5-10, *ET SEQ.*) ........................................152

COUNT FIFTY  VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE
PRACTICES  AND CONSUMER PROTECTION LAW  (S.D. CODIFIED
LAWS § 37-24-6) ............................................................................................153

COUNT FIFTY-ONE  VIOLATION OF THE TENNESSEE CONSUMER
PROTECTION ACT  (TENN. CODE ANN. § 47-18-101, *ET SEQ*.) ...........................154

COUNT FIFTY-TWO  VIOLATION OF THE TEXAS DECEPTIVE TRADE
PRACTICES CONSUMER PROTECTION ACT  (TEX. BUS. & COM. CODE
§§ 17.41, *ET SEQ*.) ........................................................................................155

COUNT FIFTY-THREE  VIOLATION OF THE UTAH CONSUMER SALE
PRACTICES ACT  (UTAH CODE ANN. § 13-11-1, *ET SEQ*.) ....................................155

COUNT FIFTY-FOUR  VIOLATION OF THE VERMONT CONSUMER FRAUD
ACT  (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ*.) .........................................156

COUNT FIFTY-FIVE  VIOLATION OF THE VIRGINIA CONSUMER PROTECTION
ACT  (VA. CODE ANN. §§ 59.1-196, *ET SEQ*.) ...........................................157

COUNT FIFTY-SIX  VIOLATION OF THE WASHINGTON CONSUMER
PROTECTION ACT  (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ*.)................158

COUNT FIFTY-SEVEN  VIOLATION OF THE WEST VIRGINIA CONSUMER
CREDIT  AND PROTECTION ACT  (W. VA. CODE § 46A-1-101, *ET SEQ*.)...........158

COUNT FIFTY-EIGHT  VIOLATION OF THE WISCONSIN DECEPTIVE TRADE
PRACTICES ACT  (WIS. STAT. § 110.18) ...................................................159

COUNT FIFTY-NINE  VIOLATION OF THE WYOMING CONSUMER
PROTECTION ACT (WYO. STAT. §§ 40-12-105 *ET SEQ*.)........................................160

DEMAND FOR JUDGMENT...............................................................................160

JURY DEMAND ................................................................................................161

010646-11  932598 V1

Plaintiffs Donald Chaires, George Denault, Jane Doe, John Doe, Brittany Gilleland, Gerald Girard, Sara Hasselbach, Lindsey Kinhan, Joseph McLaughlin, Matthew Teachman, and Karyn Wofford, on behalf of themselves and all others similarly situated, for their complaint against Defendants Sanofi U.S., Novo Nordisk Inc., and Eli Lilly and Company, allege the following based on (a) personal knowledge, (b) the investigation of counsel, and (c) information and belief.

## I.     INTRODUCTION

1.      Over 29 million people, 9.3% of the country, live with diabetes.[1]  A life-threatening disease, many of those with diabetes rely on daily insulin treatments to survive. Interruptions to these regimes can have severe consequences, including sustained damage to the kidneys, heart, nerves, eyes, feet, and skin.  Indeed, diabetes is the leading cause of kidney failure, adult-onset blindness, and lower-limb amputations in the United States.[2]

2.      Defendants Sanofi U.S., Novo Nordisk Inc., and Eli Lilly and Company, manufacture insulin used to treat diabetes.  Over the course of the last five years, each has raised the publicly-reported, benchmark prices of their respective drugs in an astounding and inexplicable manner.  Drugs that used to cost $25 per prescription now cost between $300 and $450 dollars.  And in the last five years alone, Sanofi, Novo Nordisk, and Eli Lilly have raised their benchmark prices by over 150%.  Some patients now pay almost $900 dollars per month just to obtain the insulin drugs they need to survive.

---

[1] *Statistics About Diabetes*, American Diabetes Association (May 18, 2015), http://www.diabetes.org/diabetes-basics/statistics/.

[2] *Chronic Disease Prevention and Health Promotion: Diabetes*, Centers for Disease Control Prevention (July 25, 2016), https://www.cdc.gov/chronicdisease/resources/publications/aag/diabetes.htm.

010646-11  932598 V1

3.      The impact of these price increases is such that in February 2016, the NEW YORK

TIMES published an op-ed written by an endocrinologist, with the headline "**Break Up the**

**Insulin Racket,**" citing some disturbing statistics:[3]

> What makes this so worrisome is that the Big Three have
> simultaneously hiked their prices.  From 2010 to 2015, the price of
> Lantus (made by Sanofi) went up to 168 percent; the price of
> Levemir (made by Novo Nordisk) rose by 169 percent; and the
> price of Humulin R U-500 (made by Eli Lilly) soared by
> 325 percent.

4.      Why has the price of insulin gotten so out of control?  Although drug companies

usually rely on their research and development costs to rationalize their high drug prices, the

manufacturers of insulin admit that their price hikes are unrelated to any jump in production or

research and development costs.  Instead, these increased benchmark prices are the result of a

scheme and enterprise among each Defendant and several bulk drug distributors.  In this scheme,

the Defendant drug companies set two different prices for their insulin treatments:  a publicly-

reported benchmark price—also known as the "sticker" price—and a lower, real price that they

offer to certain bulk drug distributors.

5.      The most important of these bulk drug distributors are entities known as

pharmacy benefit managers ("PBMs").

6.      Business is booming for PBMs.  Together, the three biggest benefit managers—

Express Scripts, CVS Health, and OptumRx—bring in more than $200 billion a year in revenue.

They also control over 80% of the PBM market, covering 180 million insured people.

7.      Critical actors in the drug distribution and pricing system, PBMs serve as

middlemen between health insurers and drug manufacturers.  In this role, PBMs negotiate

medicine prices with drug manufacturers on behalf of insurers.  Based in part on the prices they

---

[3] Kasia Lipska, *Break Up the Insulin Racket*, NEW YORK TIMES (Feb. 20, 2016), https://www.nytimes.com/
2016/02/21/opinion/sunday/break-up-the-insulin-racket.html.

are able to secure, the PBMs set up tiered formularies for their clients (the health insurers). Formularies are ranked lists of drugs, where cheaper and more effective medicines are generally placed into lower tiers. The health insurers rely on these formularies to determine how much of their members' drug costs they will cover. Drugs in lower, preferred formulary tiers are cheaper for plan members.

8.      Where two medicines are largely interchangeable, a PBM will sometimes exclude the more expensive of the two from its formulary. When a drug is excluded from formulary, health insurers using that formulary will not reimburse their members for purchase of that drug. As a result, formularies enable PBMs to push patients toward certain brands of drugs over others, giving them enormous control over drug purchasing behavior.

9.      To secure the PBMs' business, drug companies, including Defendants, offer PBMs prices that are lower than their publicly reported, benchmark prices. Both the PBMs and drug companies refuse to disclose these lower, real prices, labeling them trade secrets. The public-facing justification for such secrecy is: "we do not want our competitors to know the extent of our discounts."

10.     But there is a second, more nefarious reason for such concealment. As compensation for their role as negotiator, the PBMs pocket a percentage of the difference between the reported benchmark price and the undisclosed real price they secure. This difference is known as the "spread." As the spread between benchmark and real price widens, so too do the PBMs' cut. PBMs do not disclose this spread because they do not want the public to know their profit margins on medications. The Defendant drug companies do not disclose this spread because they do not want the public to realize that their benchmark prices are wildly inflated.

11.     Drug manufacturers, including Defendants, can manipulate this dynamic to the detriment of patient consumers.  Where two or more drug manufacturers make largely interchangeable products, those companies would, in an ideal world, continuously drop their real prices to undercut the prices offered by their competitors.  But the practice of publicly-publishing one price, while secretly offering another, has enabled drug manufacturers competing within the same therapeutic class to secure PBM business without significantly reducing their real prices.  The drug companies know that the PBMs stand to profit from large spreads between real and benchmark prices.  Inflated benchmark price increases do not cost the PBMs so long as real prices remain constant (after all, they pay the real price, not the benchmark price).  Taking advantage of these realities, drug manufacturers competing with the same therapeutic class have begun to offer the PBMs higher *benchmark price*s instead of lower *real* prices.  In other words, instead of marketing lower *real* prices to PBMs, they market the spread *between* prices.  The drug manufacturer with the largest spread between benchmark and real price is more likely to secure a PBM's preferred formulary position, and, as a result, the business of that PBM's clients.

12.     This is exactly what has occurred in the market for analog insulin treatments. Defendants Sanofi, Novo Nordisk, and Eli Lilly have offered the three largest PBMs—CVS Health, Express Scripts, and OptumRx—larger spreads as *quid pro quo* for patient business.

13.     There are two types of analog insulin:  long-acting and rapid-acting.  Sanofi and Novo Nordisk both make long-acting analog insulin—Lantus and Levemir, respectively.  These drugs are direct competitors in the long-acting insulin category.  Novo Nordisk and Eli Lilly compete in the rapid-acting category, manufacturing Novolog and Humalog, respectively.

14.     All three Defendants have exponentially raised the benchmark prices of their medicines while maintaining constant (and even slightly lowering) their real prices.  This

behavior has enabled them to market larger spreads to the big PBMs in exchange for formulary

status.  Insidiously, an arms race in the escalation of reported benchmark prices—and

consequently spreads—has ensued between Defendants: each Defendant raises its benchmark

price just a bit more than its competitors, encouraging the large PBMs to keep its drug on

formulary.  And Defendants have done so in perfect lock step:

**Figure 1: Sanofi and Novo Nordisk Increase Long-Acting Insulin Benchmark Prices in Lock-Step[4]**



Source: Bloomberg Intelligence analysis of Symphony Health Solutions data

---

[4] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep.

**Figure 2: Eli Lilly and Novo Nordisk Increase Rapid-Acting Insulin Benchmark Prices in Lock-Step[5]**



15.     Eli Lilly basically admitted to the spread pricing scheme in a statement issued in January 2017 from Eli Lilly spokeswoman Julie Williams:

> There is a wide and growing discrepancy between the published "list price" Lilly sets and the "net price" that Lilly actually receives.
>
> The list price (also known as the wholesale acquisition cost or WAC) is the price that a manufacturer sets as a starting point for negotiations with federal and state governments, private insurers, and pharmacy benefit managers to gain formulary access. Manufacturers also use list price in negotiations with wholesalers and others involved in the distribution process.
>
> The amount the manufacturer receives after all discounts and rebates are applied is considerably less than the list price. For example, the net price for Humalog – our most commonly used insulin – increased by 4 percent over the five-year period of 2009 to 2014, which is a much smaller increase than what some consumers have experienced.

---

[5] Lydia Ramsey, *A 93-year-old Drug that Can Cost more than a Mortgage Payment Tells Us Everything that's Wrong with American Healthcare*, Business Insider (Sept. 16, 2016), http://www.businessinsider.com/insulin-prices-increase-2016-9.

16.     The NEW YORK TIMES op-ed called for transparency in setting prices:[6]

> In the meantime, we need a fair and transparent system for setting prices.  In much of Europe, insulin costs about a sixth of what it does here.  That's because the governments play the role of pharmacy benefit managers.  They negotiate with the manufacturer directly and have been very effective at driving down prices. In the United States, we rely on the private sector and a free market for drug pricing.  But in order for this to work, we need to regulate it better and demand greater transparency.

17.     This benchmark price inflation has a victim—patients who rely on insulin to stay alive.  Patients' out-of-pocket payments for their medications are typically based on their drugs' reported *benchmark price*s, not their concealed *real* prices.  As a result, Defendants' benchmark price arms race has saddled individuals living with diabetes—whether insured and paying benchmark prices before they hit their large deductibles, insured and paying increasingly common coinsurance, or uninsured and paying full benchmark prices for all drugs—with crushing out-of-pocket expenses.

18.     The physical, emotional, and financial tolls of paying such excessive prices for insulin are devastating.  Unable to afford their insulin drugs, patients report under-dosing their insulin, injecting expired insulin, and starving themselves to control their blood sugars with as little insulin as possible.  These behaviors are dangerous for people living with diabetes.  Because they ineffectively control those individuals' blood sugar levels, these practices can lead to serious complications such as kidney failure, heart disease, blindness, infection, and amputations.  Unable to afford the insulin her doctor prescribes, one patient reports she is currently losing circulation to her foot.  She may lose the foot if she does not find a way to obtain the insulin she needs at a lower price.  Other class members have intentionally allowed themselves to slip into Diabetic Ketoacidosis—a potentially fatal blood syndrome caused by lack

---

[6] Lipska, *supra* n.3.

of insulin in the body—so that they can obtain insulin samples from hospital emergency rooms. Multiple Class members explain that they now avoid the doctor because their inability to afford insulin has caused their blood sugars to spike.  They know that their doctors will prescribe more insulin to treat this problem, and they simply cannot afford to take any more insulin.  Other patients describe how the amount they spend on insulin makes it impossible for them to maintain the healthy diet that people with diabetes need, further compromising their health:  "Eating healthy is expensive and if I have to choose between my insulin and eating right, I'll buy my insulin, even if I know it's making my diabetes worse."  Thus, while the purpose of insulin is to improve the health of those living with diabetes, the rising and excessive costs of these drugs are actually forcing them to harm their health.

19.     The financial strain of these excessive insulin prices infects all areas of patients' lives.  Stories of patients taking out loans and accruing debt to afford insulin are common. Multiple patients estimated that they spend over 50% of their monthly income on insulin medications.  Some patients have been unable to leave bad jobs for fear of losing their health insurance; others have been encouraged to leave good jobs for positions that might pay more or have better insurance.  Many patients describe rearranging their lives around their insulin costs— keeping lights off and the heat low to avoid high electricity bills, moving back in with parents, and even leaving school.  One patient's husband joined the U.S. Navy, in part, so that she could get her insulin through the U.S. Navy health plan.  As another patient put it, "[f]inancially, it's killing me."

20.     The financial difficulties that the price hikes have imposed upon those living with diabetes also have serious mental health consequences.  Many patients describe the constant stress and worry that accompanies not knowing how they will pay for next month's insulin

supply.  "I often cry, and I think, have I done something wrong that I can't afford to take care of myself?"  Another patient explained that she tries not to fill her prescription too often because the cost of her insulin causes her to fight with her husband.  Still others express anger and a deep sense of betrayal that a once affordable drug is now completely unaffordable.  "I feel so taken advantage of; now, I can't afford my medications, and for what?  All so some drug company can profit from my sickness?"  In short, a medication that should be a source of health has instead become a cause of pain.

21.     This action alleges that the three makers of analog insulin drug products—Sanofi, Novo Nordisk, and Eli Lilly—violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, and various state consumer protection laws by engaging in a scheme and enterprise whose purpose was unlawfully inflating the benchmark prices of rapid- and long-acting analog insulin drugs and then marketing the spread between the benchmark prices and real prices to PBMs.  This scheme directly and foreseeably causes consumers to overpay for these life-saving medications.

## II.     PARTIES

### A.     Plaintiffs

22.     Plaintiff Donald Chaires is a citizen of the Commonwealth of Massachusetts and resides in Springfield, Massachusetts.

23.     Mr. Chaires has type 2 diabetes and is currently taking Lantus brand insulin to treat his diabetes.  In the past, he has taken Humalog brand insulin.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay for 40% of his insulin drugs—about $456 per month for his Lantus prescription.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

24.     Plaintiff George Denault is a citizen of the Commonwealth of Massachusetts and resides in Natick, Massachusetts.

25.     Mr. Denault has type 2 diabetes and is currently taking Lantus and Humalog brand insulin to treat his diabetes.  In the past, he has taken Levemir and Novolog brand insulin.  He is insured by MassHealth.  In the past, when he was taking Levemir and Novolog, he was uninsured and paid about $900 per month total for Levemir and Novolog.  As a direct result of the scheme, he has overpaid for Levemir and Novolog.

26.     Plaintiff Jane Doe is a citizen of the Commonwealth of Massachusetts and resides in Taunton, Massachusetts.

27.     Ms. Doe has type 2 diabetes and is currently taking Lantus brand insulin to treat her diabetes.  She is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where she must pay for 40% of her insulin drugs—about $200-300 per month for her Lantus prescription.  As a direct result of the scheme, she has overpaid for Lantus.

28.     Plaintiff John Doe is a citizen of the Commonwealth of Massachusetts and resides in Braintree, Massachusetts.

29.     Mr. Doe has type 1 diabetes and is currently taking Novolin brand insulin to treat his diabetes.  In the past, he took Humalog brand insulin.  He is currently insured by the Veterans Administration.  But in the past, he was uninsured and paying about $100 per month for his Humalog prescription.  As a direct result of the scheme, he has overpaid for Humalog.

30.     Plaintiff Brittany Gilleland is a citizen of the State of Washington and resides in Oak Harbor, Washington.

31.     Ms. Gilleland has type 1 diabetes and is currently taking Novolog brand insulin to treat her diabetes.  In the past, she has taken Lantus and Humalog brand insulins.  She is

currently insured under her husband's U.S. Navy health plan.  But in the past, she was uninsured and paying about $250 per month total for Lantus and Humalog.  As a direct result of the scheme, she has overpaid for both Lantus and Humalog.

32.    Plaintiff Gerard Girard is a citizen of the Commonwealth of Massachusetts and resides in Fairhaven, Massachusetts.

33.    Mr. Girard has type 2 diabetes and is currently taking Lantus and Humalog brand insulin to treat his diabetes.  In the past, he has taken Novolog brand insulin.  He is insured under Medicare Part D and consistently reaches the Medicare Part D "Donut Hole" where he must pay for 40% of his insulin drugs—about $365 per month for his Lantus prescription alone.  As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

34.    Plaintiff Sara Hasselbach is a citizen of the State of California and resides in San Diego, California.

35.    Ms. Hasselbach has type 1 diabetes and is currently taking Novolog and Lantus brand insulin to treat her diabetes.  She is insured through her employer in a high-deductible health plan.  She pays for her insulin drugs out-of-pocket until she reaches her deductible, and then she pays 20% coinsurance.  As a direct result of the scheme, she has overpaid for both Lantus and Novolog.

36.    Plaintiff Lindsey Kinhan is a citizen of the Commonwealth of Massachusetts and resides in Oxford, Massachusetts.

37.    Ms. Kinhan has type 1 diabetes and is currently taking Humalog brand insulin to treat her diabetes.  She is insured in a high-deductible health plan.  She pays for her insulin drugs out-of-pocket until she reaches her deductible, and then she pays 15% coinsurance.  Before she hits her deductible, she pays about $300 per month for her Humalog prescription.  After she

reaches her deductible, she spends about $130 per month on her Humalog prescription. As a direct result of the scheme, she has overpaid for Humalog.

38.     Plaintiff Joseph McLaughlin is a citizen of the Commonwealth of Massachusetts and resides in South Dartmouth, Massachusetts.

39.     Mr. McLaughlin has type 2 diabetes and is currently taking Relion brand insulin to treat his diabetes. He was previously taking Lantus and Humalog brand insulin, but had to stop because they were too expensive. He is insured through Medicare Part D. Before he switched to Relion, he consistently hit the Medicare Part D "Donut Hole" where he paid for 40% of his insulin drugs—about $400 per month total for his Lantus and Humalog prescriptions. As a direct result of the scheme, he has overpaid for both Lantus and Humalog.

40.     Plaintiff Matthew Teachman is a citizen of the State of Florida and resides in Port Orange, Florida.

41.     Mr. Teachman has type 1 diabetes and is currently taking Novolog brand insulin to treat his diabetes. He is insured through his employer in a high-deductible health plan. He pays for his insulin drugs out-of-pocket until he reaches his deductible, and then he pays 30% coinsurance. Before he hits his deductible, he pays between $400-500 per month for his Novolog prescription. After he reaches his deductible, he spends about $220 per month on his Novolog prescription. As a direct result of the scheme, he has overpaid for Novolog.

42.     Plaintiff Karyn Wofford is a citizen of the State of Georgia and she resides in Jackson, Georgia.

43.     Ms. Wofford has type 1 diabetes and is currently taking Lantus and Humalog brand insulin to treat her diabetes. She is insured through the Georgia Healthcare Marketplace in a high-deductible health plan. She pays for her insulin drugs out-of-pocket until she reaches her

- 12 -

deductible, and then she pays 40% coinsurance.  She started this plan in January, and under this

plan she will pay about $500 per month for her Humalog prescription and $375 per month for

her Lantus prescription before she reaches her deductible.  She cannot afford to hit her deductible

and is unsure what she will do when she can no longer afford her insulin.  As a direct result of

the scheme, she has overpaid for both Lantus and Humalog.

44.     On information and belief, each Plaintiff paid out-of-pocket for insulin and that

payment was based on the artificially inflated benchmark price.  As a result, each Plaintiff has

been injured.

45.     Certain Plaintiffs regard their condition and payment issues to be personal

information and hence are suing as "Jane Doe" or "John Doe."  Upon entry of a protective order

in this case, they will disclose their names to Defendants.

**B.     Defendants**

46.     Defendant Sanofi U.S. is a Delaware limited liability corporation with its

principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey 08807.

Sanofi manufactures Lantus used for the treatment of diabetes.  Sanofi's revenue from Lantus in

2016 was $6.98 billion, and over $4 billion in each year since 2013.  Sanofi's SEC Form 20-F

for the year 2015 notes that "Lantus is particularly important; it was the Group's leading product

… representing 17.2% of … net sales …."

47.     Defendant Novo Nordisk Inc. is a Delaware corporation and has its principal

place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.  Novo Nordisk

manufactures Novolog and Levemir, which are used for the treatment of diabetes.  Novo

Nordisk's revenue from the sale of Novolog in 2016 was $3.03 billion, and over $2 billion in

2014 and 2015.  Revenues from Levemir were $955 million in 2013, $1.3 billion in 2014, and

$1.3 billion in 2015.  Sales to diabetic patients is such a critical part of Novo Nordisk's business

that the 2015 Annual Report's cover page states in bold letters asks "**Why Do So Many People in Cities Get Diabetes?"**

48.     Defendant Eli Lilly and Company is a corporation organized and existing under the laws of the State of Indiana and has a principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.  Eli Lilly manufactures Humalog, which is used for the treatment of diabetes.  Lilly's revenue from Humalog in 2016 was $2.84 billion.  Lilly's revenues from Humalog were $1.5 billion in 2013 and $1.7 billion in 2015.

### III.     JURISDICTION AND VENUE

49.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, and under 18 U.S.C. § 1964(c) because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(d), which provides federal district courts with original jurisdiction over civil actions in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of Plaintiffs is a citizen of a state different from any Defendant.  Finally, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

50.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c), and 18 U.S.C. § 1965, because each Defendant transacts business in, is found in, and/or has agents in the District of Massachusetts, and because some of the actions giving rise to the complaint took place within this district.

51.     The Court has personal jurisdiction over each Defendant.  Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district.  The

scheme and conspiracy have been directed at, and have had the intended effect of, causing injury

to persons residing in, located in, or doing business throughout the United States, including in

this district.

## IV.    DRUG PRICING IN THE UNITED STATES

### A.    The Entities Involved in Drug Pricing

52.    The prescription drug industry consists of an opaque and complex network of

entities engaged in multiple distribution and payment structures.  These entities include

pharmaceutical companies, wholesalers, pharmacies, health insurers, pharmacy benefit

managers, and patient-consumers.

53.    ***Pharmaceutical Companies***.  Pharmaceutical companies (also known as drug

companies or drug manufacturers) own the rights to manufacture and market drugs.  This

remains true even if these companies contract out the actual production of their drugs.

Pharmaceutical companies typically own or contract with facilities that manufacture drugs and

then sell their products to wholesalers.[7]  Defendants here are pharmaceutical companies.

54.    ***Wholesalers***.  After production, many manufacturers send their drugs to FDA-

registered drug wholesalers for further distribution.[8]  Wholesalers purchase, inventory, and sell

pharmaceutical products to a variety of providers, including retail pharmacy outlets, hospitals,

and clinics.[9]  States license or authorize wholesalers that sell and distribute pharmaceuticals

---

[7] *See, e.g.*, Ernst Berndt & Joseph Newhouse, *Pricing and Reimbursement in U.S. Pharmaceutical Markets* (Harvard Kennedy School, National Bureau of Economic Research, Sept. 2010), at 8.

[8] *Id.*

[9] *See Guidance for Industry: Prescription Drug Marketing Act (PDMA) Requirements*, Food and Drug Admin. (Nov. 2006), at 3, *available at* http://www.fda.gov/downloads/drugs/guidancecomplianceregulatoryinformation/ guidances/ucm134399.pdf.

within their borders.[10]  The wholesaler market in the United States is dominated by three

companies:  AmerisourceBergen Corp., Cardinal Health, Inc., and McKesson Corp.[11]

55.  ***Health Insurers***.  Health insurers submit payments on behalf of insured

individuals to health care providers for services rendered to the insured individuals.[12]  Health

insurers also cover a portion of their members' drugs costs, submitting payments to pharmacies

on behalf of their members.  The term "health insurers" covers self-insured businesses, insurance

companies, including those that participate in Medicaid and Medicare, and union-run health

plans.[13]

56.  ***Pharmacy Benefit Managers***.  As previously explained, pharmacy benefit

managers ("PBMs") act as intermediaries between drug manufacturers and health insurers.[14]  In

this role, PBMs perform a variety of services on behalf of their health care payer clients,

including the negotiation of drug prices with drug companies, creation of formularies,

management of prescription billing, construction of retail pharmacy networks for insurers, and

provision of mail-order services.[15]  Nonetheless, they generally are "not a direct link in the

physical supply chain for pharmaceutical products" because, in most instances, they do not take

possession or control of prescription drugs.[16]  The largest PBMs are Express Scripts Holdings

---

[10] *See Profile of the Prescription Drug Wholesaling Industry*, Food and Drug Admin., 3, *available at* http://www.fda.gov/ohrms/dockets/dockets/05n0403/05n-0403-bkg0001-04-02-1.pdf.

[11] *See* Susan Thaul, *Pharmaceutical Supply Chain Security*, Cong. Research Serv., R43106, 4 (Oct. 31, 2013).

[12] *See* Thomas Bodenheimer, *High and Rising Health Care Costs. Part 1: Seeking an Explanation*, 142 Ann. Internal Med. 847, 847 (May 17, 2005).

[13] *Id.*

[14] *See* Thomas Gryta, *What is a 'Pharmacy Benefit Manger'*, WALL STREET JOURNAL (July 21, 2016), http://www.wsj.com/articles/SB10001424053111903554904576460322664055328.

[15] *Id.*

[16] *See* The Health Strategies Consultancy LLC, *Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain*, The Kaiser Family Foundation, 14 (Mar. 2005), http://avalere.com/research/docs/ Follow_the_Pill.pdf.

Co., CVS Health Corp., and UnitedHealth Group's OptumRx.[17]  Some of these PBMs, such as

CVS Health, are part of corporations that also own their own retail pharmacies.

**B.      The Drug Payment & Distribution Structure**

57.      While payment varies from drug to drug, the basic payment structure follows this

rubric:  The patient pays her health insurer (via her health insurance premium), which pays the

pharmacy, which pays the wholesaler and PBMs, which pays the pharmaceutical company.

Similarly, while distribution systems vary across drugs, the common structure involves the drug

manufacturer distributing to the pharmacies and wholesalers, who then distribute to the patient-

consumers.

58.      The figure below illustrates this highly complex payment structure.[18]  This figure

labels certain payments "payment" and others "negotiated payment."  The term "payment" refers

to individual payments, made at the time of delivery.  For example, when a patient walks into a

pharmacy and picks up her prescription.  At that moment, her health plan also pays a service fee

to its PBM for dispensing the drug through its network of retail pharmacies.  In contrast,

"negotiated payment" is a payment made under a negotiated contract.  For example, a PBM

might negotiate a contract with a drug manufacturer for supply of X drug for $Y per pill for two

years.  The figure also indicates the flow of products and rebates.

---

[17] *See Pharmacy-Benefit Managers*, THE WALL STREET JOURNAL (Mar. 30, 2015), http://blogs.wsj.com/briefly/2015/03/30/pharmacy-benefit-managers-the-short-answer/.

[18] U.S. Gov't Accountability Office, *Generic Drugs Under Medicare*, GAO-16-706, at 7 (Aug. 2016).

**Figure 3: The U.S. Drug Payment Structure[19]**



59.    When an insured consumer buys a medication from a pharmacy, her insurer pays the pharmacy based on the price its PBM negotiated.  In addition to her insurer's payment, the patient usually pays her pharmacy a portion of her medication's cost, out-of-pocket.

60.    Insurers get their cash flow from consumers, who purchase insurance coverage. Consumers typically pay their insurers fixed monthly premiums for their health insurance plans. The health insurer relies on these monthly premiums to pay for the prescription drug needs of its members.

61.    Pharmacies usually obtain the drugs they distribute from wholesalers or the manufacturers.  The wholesalers purchase these drugs directly from the pharmaceutical manufacturers.[20]

---

[19] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/ 2016/mar-apr/rising-costs-insulin.html.

C.      **Different Prices for Different Players**

62.      The prices for the drugs distributed in this chain are different for each participating entity.  In other words, different actors pay different prices for the same drugs.  In this system, only a drug's benchmark price—also known as its Average Wholesale Price ("AWP")—is publically reported.

63.      This price serves as the starting point for negotiations between PBMs and drug manufacturers.  PBMs use their formulary control to exact steep discounts from drug companies, known as "rebates."  As previously explained, PBMs create formularies for their health insurer clients and those formularies significantly influence patients' drug purchasing behavior.  Health insurers cover all or a portion of their members' drug costs based on whether and where drugs fall on the PBMs' formularies.  Sometimes, a drug company will offer one large PBM a deeper price discount than it offers other PBMs in exchange for an exclusive formulary position.  The PBM's health insurer clients, who adhere to the PBM's formulary, will then only reimburse their plan members for purchase of the drug with the exclusive position.  As a result, PBMs have significant control over what drugs consumers purchase.[21]  They are able to leverage this power to procure deep price discounts.

64.      PBMs pass on an undisclosed portion of the discounts or "rebates" they receive to their health insurer clients.  Therefore, insurers also pay much lower prices than the benchmark prices.

65.      Wholesalers are also able to use their bulk purchasing power to negotiate lower drug prices from the drug companies.

---

[20] *See* U.S. Dep't of Health & Human Servs., The Assistant Sec'y for Planning and Evaluation, *Prescription Drug Prices*, 100 (Apr. 1, 2000), https://aspe.hhs.govisites/defaultifiles/pdfi1721711c3.pdf.

[21] *See* Robert F. Atlas, *The Role of PBMs in Implementing the Medicare Prescription Drug Benefit*, 23 Health Affairs w4-504, w4-507 (July 2004).

66.     In the end, the only actors who actually pay the full drug benchmark prices are consumers who are uninsured or insured but paying for drugs out-of-pocket before they hit their deductibles.  Rising benchmark prices also harm patients who pay coinsurance or reach the Medicare Part D "Donut Hole," because these consumers' payments are tied to the drugs' benchmarks prices.  As benchmark prices rise, so too do consumer payments.

### D.     Consumer Drug Costs

67.     *Uninsured*.  Uninsured consumers must pay the full benchmark price every time they pick up their prescriptions.  Despite the Affordable Care Act's expansion of Medicaid coverage and establishment of Health Insurance Marketplaces, millions of people—28.5 million in 2015—remain without coverage.  This uninsured population is especially concentrated in states that did not take the Medicaid expansion, where diabetes is prevalent.  Of the 28.5 million uninsured, reports indicate that 46% tried to get coverage but could not afford it.  The uninsured population may grow drastically in the next few years if the Affordable Care Act is repealed without a suitable replacement.

68.     But the uninsured are not the only patients saddled with high out-pocket-costs.  Despite their monthly insurance premiums, insured consumers often still pay all or a part of drug benchmark prices.  Out-pocket-costs for insured consumers come in three forms:  deductibles, coinsurance requirements, and/or copayment requirements.

69.     *High Deductible Plans*.  The term "deductible" refers to a set amount of healthcare cost an insured must pay for by herself (out-of-pocket) before her plan will begin to contribute to her healthcare costs.  Once a patient reaches her deductible, her health plan begins to contribute, paying a portion of her healthcare costs.  Although most health plans have some form of a deductible, high-deductible health plans are aptly named for their larger-than-average deductibles.  And while high-deductible health plans usually boast lower premiums, they are

nonetheless more onerous to patients and families that need expensive care on a regular basis. Insured individuals in high-deductible plans must usually pay full benchmark prices until they hit their deductibles.

70.     The past decade has witnessed a shift away from traditional health plans, which provide broader coverage, toward high-deductible health plans.  In their 2016 survey of employer health benefits, the Kaiser Family Foundation found that 29% of all covered employees are now enrolled in high-deductible health plans, up from 17% in 2011.  Although Preferred Provider Organizations ("PPOs") are still the most common plan type (48% of Americans are enrolled in PPOs), enrollment in PPOs has fallen 10% over the last two years, while enrollment in high-deductible health plans has increased by 8%.  Figure 4 illustrates the rising trend in high deductible plans.

**Figure 4: Percentage of Covered Workers Enrolled in High-Deductible Health Plans from 2006-2016[22]**





<hr>

[22] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation, 3 (2016), https://kaiserfamilyfoundation.files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

71.     Moreover, deductibles themselves have risen.  The average annual deductible for an individual enrolled in a high-deductible plan is now between $2,031 and $2,295, depending on the exact type of plan.[23]  The average annual deductible for family coverage is now between $4,321 and $4,364, again, depending on the type of plan.

72.     Overall, in the entire employer-based health plan market, deductibles have risen 12% since 2015—four times faster than premiums increased in the same period.  Among all individuals enrolled in employer health plans (both high-deductible plans as well as others), the average deductible in 2016 was $1,478.

73.     The average deductible for individuals working at smaller firms is higher than that in large firms ($2,069 vs. $1,238).

74.     Figure 5 shows the increase in health plans with a general annual deductible of $1,000 or more, broken down by firm size.

**Figure 5: Percentage of Covered Workers Enrolled in a Plan with a General Annual Deductible of $1000 or More for Single Coverage, by Firm Size, from 2006-2016[24]**



* Estimate is statistically different from estimate for the previous year shown (p < .05).

NOTE: These estimates include workers enrolled in HDHP/SO and other plan types. Average general annual health plan deductibles for PPOs, POS plans, and HDHP/SOs are for in-network services.

SOURCE: Kaiser/HRET Survey of Employer-Sponsored Health Benefits, 2006-2016.



---

[23] There are two primary types of high-deductible health plans: high-deductible plans with Health Reimbursement Arrangements and high-deductible plans with Health Savings Accounts.

[24] *2016 Employer Health Benefits Survey*, Kaiser Family Foundation, 4 (2016), https://kaiserfamilyfoundation. files.wordpress.com/2016/09/employer-health-benefits-2016-summary-of-findings.pdf.

75.     The average deductibles for plans available under the Affordable Care Act on the Marketplace Exchanges are also high.  The Marketplace health plans are broken into "metal" tiers:  bronze, silver, gold, and platinum.  The cheapest plans—bronze and silver—unsurprisingly come with very high deductibles.  In 2016, the average deductible in such plans were $5,765 for bronze plans (up from $5,328 in 2015) and $3,064 for silver plans (up from $2,556 in 2015).

76.     Many individuals and families cannot afford to hit their high-deductible costs year after year.  As a result, rising drug benchmark prices are particularly harmful to patients in high-deductible plans.

77.     ***Coinsurance and Copayments***.  In addition to their deductibles, individuals with insurance must usually make copayments or coinsurance payments for the healthcare services they need.  A copayment is a fixed fee that an individual must pay for a healthcare service at the time of care.  For drugs, copayments are fixed fees that consumers pay when they pick up their prescriptions.  Copayment rates vary depending on the drug; drugs in preferred formulary positions have lower copays, and drugs in disfavored formulary positions require larger copays.

78.     Coinsurance is similar.  However, instead of paying a fixed fee for a particular service, individuals with coinsurance arrangements must pay a fixed *percentage* of the cost of the healthcare service provided.  For drugs, this means a percentage of the drug's benchmark price.  This percentage varies depending on the drug, with lower coinsurance rates for preferred drugs, and higher coinsurance rates for disfavored drugs.

79.     For those who must pay full benchmark prices until they hit their deductibles, copayments and coinsurance obligations begin after they reach their deductibles.  Plans that cover prescription drugs right away, not requiring patients to reach their deductibles first, require copayments or coinsurance contributions for every drug purchase.

80.     For covered workers enrolled in health plans with three or more tiers of cost

sharing for prescription drugs, average coinsurance rates are 17% for first-tier drugs, 25% for

second-tier drugs, 37% for third-tier drugs, and 29% for fourth-tier drugs.  Lantus, Levemir,

Humalog, and Novolog are still branded drugs.  Therefore, insurance plans generally classify

them as second or third-tier drugs on their formularies.  As a result, coinsurance payments for

these drugs can be quite burdensome.

81.     Recently, health plans have been demanding higher and higher coinsurance

contributions from patients.  Table 1 shows this trend.

### Table 1: Rising Coinsurance Rates

| Retail Coinsurance Payment | | | |
|---|---|---|---|
| | T2 Brand | T3 Brand | Flat |
| 1998 | 24.7% | 26.0% | 20.7% |
| 1999 | 24.9% | 26.9% | 21.0% |
| 2000 | 26.0% | 28.0% | 22.0% |
| 2001 | 24.0% | 29.0% | 20.0% |
| 2002 | 24.4% | 34.7% | 23.0% |
| 2003 | 24.3% | 32.4% | 22.0% |
| 2004 | 25.0% | 32.0% | 25.0% |
| 2005 | 26.5% | 35.6% | 23.0% |
| 2006 | 26.2% | 36.0% | 23.0% |
| 2007 | 26.4% | 37.9% | 22.0% |
| 2008 | 26.1% | 37.0% | 24.0% |
| 2009 | 26.3% | 35.8% | 22.0% |
| 2010 | 25.2% | 36.6% | 24.0% |
| 2011 | 25.6% | 37.9% | 23.0% |
| 2012 | 26.1% | 37.6% | 22.0% |
| 2013 | 25.5% | 37.1% | 22.0% |
| 2014 | 24.3% | 35.9% | 22.0% |
| 2015 | 27.1% | 41.8% | 22.0% |

82.     Overall, out-of-pocket spending for prescription drugs has shifted away from

copayments, toward deductible and coinsurance spending over the past decade.  In 2014, patients

paid for 24% of their out-of-pocket prescription drug expenses through deductibles, compared to

just 4% in 2004.  Similarly, patients paid for 20% of their out-of-pocket drug expenses through

coinsurance in 2014, compared to just 3% in 2004.

83.    *Medicare Part D.*  Finally, patients in Medicare Part D plans—Medicare's prescription drug program—often pay a large portion of their drugs' benchmark prices.  In 2017, the Medicare Part D standard prescription drug plan will have a $400 deductible and a 25% coinsurance obligation up to an initial coverage limit of $3,700.  Once Medicare Part D patients meet this $3,700 limit, they fall into the coverage gap, more commonly known as the "Donut Hole."  In the Donut Hole, patients must pay 40% of their brand-name drugs' benchmark prices.  Only once patients total out-of-pocket spending reaches $4,950 will Medicare begin to shoulder 80% of their healthcare costs again.  Figure 6 demonstrates patient cost-sharing in the standard Medicare Part D plan for 2017.

**Figure 6: Standard Medicare Prescription Drug Benefit, 2017[25]**



[25] *The Medicare Part D Prescription Drug Benefit,* The Kaiser Family Foundation, 6 (Sept. 26, 2016), http://kff.org/medicare/fact-sheet/the-medicare-prescription-drug-benefit-fact-sheet/.

84.     This complex price system leads to patient consumers paying drastically higher prices for insulin than their insurers (if they have insurance).  If a patient is responsible for all of her drugs costs before she hits her deductible, she must pay the *benchmark price* until she meets her deductible; if she pays coinsurance, she pays for a percentage of the drug's *benchmark price*; if she is in a Medicare Part D plan and reaches the Donut Hole, she must pay 40% of her brand-name drugs' benchmark prices.  In contrast, insurers receive discounts off the drug companies' benchmark prices, through their PBMs.[26]  In other words, an insurer's payment to the pharmacy at the point of purchase is based on a lower price than the patient's payment.

85.     An example helps illustrate this structure.  A woman with diabetes needs to purchase a box of insulin pens.  She goes to her local retail pharmacy where the pharmacist tells her the box's benchmark price is $450.  She has health insurance through her employer, and her insurance plan requires her to pay a $2,000 deductible and then 30% coinsurance after she has hit her deductible.  If she has not yet reached her deductible, she pays $450 for the box of insulin.  If she has reached her deductible (already paid $2,000 in health care costs), she pays $135 to the pharmacy ($450 x .3) for the box.  Her insurance covers the rest of the box's cost.  If she assumes that her insurer is paying the remaining $315, she is wrong.  The price of this insulin box to her insurer is likely much lower because her insurer has a contract with a PBM and that PBM has negotiated a rebate on the box from the drug company.  Although the benchmark price (the one the consumer sees) is $450, the rebated price to the PBM, and therefore the insurer, is much lower.

---

[26] *See* Congressional Budget Office, *Prescription Drug Pricing in the Private Sector*, 12 (Jan. 1, 2007).

E.     **Manipulation of Cost-Saving Incentives:  Drug Benchmark Price Competition and the Secret Rebates to PBMs**

86.     PBMs turn a profit in two primary ways:  First, their health insurer clients pay them service fees for processing prescriptions and operating mail-order pharmacies.  Second, PBMs take a cut of the drug rebates they negotiate with drug companies (with the rest passed onto their health insurer clients).  This rebate arrangement is meant to create an incentive for PBMs to negotiate lower *real* drug prices:  the lower the real price they negotiate, the larger the spread (*i.e.*, rebates), the higher their profits.[27]  This business model should create incentives for PBMs to control drug costs.

87.     PBMs have the greatest leverage to negotiate lower prices when two or more drug companies make interchangeable products—*i.e.*, drugs within the same therapeutic class.  In such a scenario, the drug companies should compete on price, as in normal competitive markets, for the PBMs' business.

88.     Unfortunately, drug companies and PBMs have found a way to game this system.  As both the drug companies and PBMs have realized, the spread can also be enlarged by *raising benchmark prices* while holding *real prices constant*.  In exchange for this spread enlargement, the PBMs agree, either explicitly or implicitly, to favor, or at least not disfavor, the drug with the elevated benchmark price.  The drug company knows that when a drug has a large benchmark price increase, the PBM will be making substantially greater revenue yet will be paying no more than it previously did so long as the real price does not increase.

89.     Of course, manufacturers can (and do) calculate for internal purposes the net sales price at which they are able to sell their products, and the average of those net sales prices is sometimes called the average sales price (ASP) or net selling price.  While net acquisition prices

---

[27] *Id.*

and associated ASPs are known to each drug manufacturer, they are not typically published or made public.[28]  Some drug manufacturers may have a variety of terms for specific discounts that are based on class of trade, volume of purchase, market share movement, preferred formulary status, terms of payment, and other criteria.  Because net price is meant to be the net price after all forms of discounts, rebates, purchasing allowances or any other forms of economic consideration have been taken into account, discounts that contribute to the net prices, and the net prices to various PBMs, are considered proprietary and confidential by drug manufacturers.

90.     The perverse, reverse incentives for larger benchmark prices (and consequent overpayments by consumers) was described recently in  a recent report on the drug industry:

> At the whole-market level, we sense that the price protection rebate arbitrage game is driving manufacturers to higher benchmark price increases than would otherwise occur, particularly on the eve of a general election.  Price protection rebates between brand manufacturers and PBMs are common, as are fixed rebate agreements between PBMs and a significant portion of their plan sponsors.  When brand manufacturers' [benchmark price] increases exceed the price protection threshold, the manufacturers rebate the difference to PBMs, who pocket the difference when these price protection rebates grow faster than the PBMs' fixed rebate commitments to plan sponsors.  Thus all else equal in a given category, the product with the more rapid benchmark price increases is more profitable to the PBM.  Manufacturers, realizing this, don't want their products disadvantaged, and accordingly are driven to keep their rates of benchmark price inflation at least as high, and ideally just a bit higher, than peers'.  Durable benchmark price inflation is the natural result.  Net price inflation is unaffected, but unit volumes suffer as higher benchmark prices directly impact consumers who have not yet met their deductibles.[29]

---

[28] The important exception to this is Congress' recent enactment of the Medicare Modernization Act of 2003, in which Congress changed the Medicare reimbursement system for drugs and biologicals from an AWP-based system to an ASP-based system physician-administered.  This exception is not relevant here.

[29] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

91.     This is not the first instance where PBMs have been caught secretly making

money on an increase in the spread between benchmark and real prices.  In *New England*

*Carpenters Health Benefits Fund v. First DataBank, Inc.*, 244 F.R.P. 79 (D. Mass. 2007), the

court certified a class alleging that McKesson, a wholesaler, and First Data, a drug price

publisher, engaged in a scheme to inflate the benchmark prices of brand name drugs.  McKesson

asserted that a class could not be certified because PBMs had become aware of the phony

increase in the spread, and promptly acted to offset the spread by vigorously seeking rebates for

its health insurer clients.  However, part of the evidence Judge Saris relied upon in rejecting this

contention was evidence showing that the PBMs pocketed a portion of the increase in the spread

at the expense of consumers and health insurers:

> Because these PBMs benefited from the increased [benchmark
> price] spreads perpetuated by the Scheme, Plaintiffs argue that they
> had no incentive to inform [third party payers (*i.e.* health insurers)]
> of the inflated AWP, let alone fiercely compete to mitigate any
> damage. As proof, Plaintiffs quote an April 26, 2002 internal ESI
> e-mail, sent around the same time as the ESI letter, that states that
> "the AWP increases being pushed through by First Data Bank [are]
> having a very favorable impact on our mail margins."  The e-mail
> goes on to state, "Our clients will not be sympathetic to our
> financial situation since we [will have benefited] from the AWP
> increase in the mail and they hired us to control drug trend."  The
> e-mail includes a handwritten note, in response, "Let's put a lid on
> it and not make it a big deal."[30]

92.     As noted above, the PBMs can use the phony benchmark prices to their

advantage.  As a result of this scheme, the PBMs gain the opportunity to exact larger rebate

profits, without paying any more money for the drugs themselves.  And all the while, the PBMs

can boast of the "increased rebates" they have achieved, when, in reality, the "discount" they

---

[30] *New England Carpenters Health Benefits Fund v. First Data Bank, Inc.*, 248 F.R.D. 363, 367 (D. Mass 2008) (internal citations omitted).

have achieved is simply a reduction off an artificially inflated benchmark price.  The drug maker

benefits from this scheme by maintaining a formulary position it otherwise may have lost.

93.     The losers in this scheme are patients.  When drug companies inflate benchmark

prices so that they can offer PBMs larger spreads, they harm uninsured patients, who must pay

benchmark prices out-of-pocket.  They also hurt insured consumers in high-deductible plans who

must pay the artificially inflated benchmark prices until they hit their deductibles.  Consumers

paying coinsurance suffer because their coinsurance payments rise with benchmark price

increases.  So too do Medicare Part D patients, especially when they reach the Donut Hole.

## V.     LONG-ACTING INSULIN ANALOGS

### A.     Diabetes:  The Disease and Demographics

94.     The number of Americans who live with diabetes has exploded in the last half

century.  In 1958, only 1.6 million people in the United States had diabetes.  By the turn of the

century, that number had grown to over 10 million.  Just 14 years later, the head count tripled

again.  Now over 29 million people—9.3% of the country—live with the disease.  And this trend

does not appear to be slowing:  86 million Americans have prediabetes, a health condition that

significantly increases a person's risk of type 2 diabetes.

95.     Diabetes occurs when a person has too much glucose—sugar—in their blood

stream.  Normally, the human body breaks down ingested food into glucose, which in turn feeds

cells and enables them to function.  In this process, insulin functions as a key, opening the cells

and permitting glucose to enter.  A lack of insulin or responsiveness to insulin causes the process

to break down.  Glucose is unable to enter the cells, which leads to high blood sugar levels.

Unchecked, high blood sugar levels in a non-diabetic can lead to type 2 diabetes.

96.     There are two basic types of diabetes.  Ninety to 95% of Americans living with

diabetes developed the disease because they do not produce enough insulin or have become

resistant to the insulin their bodies do produce.  Known as type 2, this more common form of diabetes is typically associated with increased body weight and is often developed later in life. In contrast, type 1 diabetes occurs when a patient completely ceases insulin production.  This form of diabetes is usually diagnosed in children and young adults, but can occur at any age.  A person with type 1 diabetes does not produce any insulin and, without regular injections of insulin, they will die.

97.     When first diagnosed, many type 2 patients can initially be treated with tablets that help their bodies either secrete more insulin or better respond to the insulin they already produce.  Nonetheless, these tablets are often insufficient for patients in the long term.  To adequately control their blood sugar levels, many type 2 patients must inject insulin to supplement that which their bodies produce.  About a quarter of type 2 patients rely on insulin treatment.  In contrast to type 2 patients, individuals living with type 1 diabetes must rely on insulin treatments from the point of diagnosis until death.

98.     If left untreated or under-treated, diabetes can become a debilitating and deadly disease.  Indeed, it remains the seventh leading cause of death in the United States despite the availability of effective treatment.  People with diabetes are almost twice as likely to have heart disease or a heart attack and 1.5 times more likely to have a stroke as those without the disease. Chronic kidney disease and failure is also much more common among those with diabetes. Furthermore, diabetes damages blood vessels and nerves, leading to serious, hard-to-treat infections and even amputations.  Finally, the disease is the leading cause of blindness.

99.     The explosion in diabetes prevalence has hit minorities and the poor the hardest. Type 2 diabetes disproportionately impacts African-Americans, American Indians, Asian Americans, Hispanics/Latinos and Pacific Islanders.  For example, Native Americans are 420%

- 31 -

more likely to die from diabetes-related causes of death than other Americans.  With decreased

access to nutritious food sources and fitness options, low income individuals are at a greater risk

of obesity and, correspondingly, diabetes.  These same demographic groups also account for a

disproportionate share of the uninsured.

**B.       The Origins of Insulin Treatment**

100.      Despite its potentially deadly impact, diabetes is a highly treatable illness.  For

patients who are able to follow a prescribed treatment plan consistently, the harmful symptoms

and health complications associated with the disease are entirely avoidable.  And what's more,

unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

101.      A "widely celebrated tale of biomedical serendipity,"[31] the innovation of insulin

treatment is revered for two reasons.  First, the duo that discovered how to extract insulin for

patient treatment was an unlikely pair:  a young orthopedic surgeon without laboratory training,

Frederick Banting, and his medical-student assistant, Charles Best.  In 1922, the two men

pioneered a technique for removing active insulin from an animal pancreas that could then be

used to treat human patients with diabetes.  Prior to this innovation, diabetes was almost always a

death sentence.

102.      However unlikely Banting and Best were as pharmaceutical innovators, the

second reason for their fame is even more striking—especially to those familiar with the current

pharmaceutical industry.  At first, neither Banting nor Best applied for a patent on their game-

changing innovation because they wanted their discovery to be open to the public, available to

all.  Ironically, they eventually ended up filing a patent to ensure access:  Banting and Best

realized that if they did not patent their drug, someone else would.  To prevent others from

---

[31] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

obtaining exclusive rights and restricting supply, Banting and Best obtained a patent and then

sold it to the University of Toronto for $1 each.  As they wrote to the University's president, the

patent was a form of publication:  "When the details of the method of preparation are published

anyone would be free to prepare the extract, but no one could secure a profitable monopoly."[32]

103.    After selling their patent to the University of Toronto, university researchers

attempted to manufacture insulin on campus.  However, they quickly realized they lacked the

expertise necessary to meet the demand of the North American market.  Therefore, to scale

production, the University of Toronto teamed up with Eli Lilly, "an established pharmaceutical

company with experience producing glandular extracts."[33]  Under this arrangement, Eli Lilly was

allowed to apply for U.S. patents on any improvements to the manufacturing process.  In

addition to their contract with Eli Lilly, the Toronto team licensed the rights to produce insulin to

a few other companies, including Denmark's Nordisk Insulinlaboratorium and Novo Terapeutisk

Laboratorium.[34]  Those initial licenses laid the groundwork for Eli Lilly and Nordisk's future

domination of the insulin market.

104.    Although the Toronto team's early iteration of insulin was immediately perceived

as "a lifesaving drug of vast clinical public health significance,"[35] subsequent research led to

further improvements in the drug's efficacy.  The original animal insulin isolated by the Toronto

team was short acting—it only had an effect on patient blood sugar levels for three to six hours.

In the early 1930s, scientists at Nordisk discovered that the addition of a certain protein to insulin

altered its absorption into the blood stream, prolonging its effect.  This form of insulin became

---

[32] M. Bliss, *The Discovery of Insulin* (2013).

[33] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1171 (2015).

[34] Nordisk and Novo merged in 1989 to form Novo Nordisk.

[35] Jeremy A. Greene & Kevin R. Riggs, *Why Is There No Generic Insulin? Historical Origins of a Modern Problem*, 372 N. Eng. J. Med. 1171, 1172 (2015).

known as long-acting.  A subsequent innovation in 1946—the addition of zinc to form the

crystalline protamine-isophane insulin, now known as neutral protamine Hagedorn (NPH)—

made it possible to combine long-acting and rapid-acting insulin.  This advance allowed many

diabetes patients to take a single daily injection.  Soon afterward, a method for prolonging the

action of insulin without adding protamine was discovered.  These improvements offered

important new options for the dosing of insulin.  But they also extended the reach of insulin

patents into the 1970s.

105.    When the animal-based insulin patents finally began to expire, researchers made

another leap forward in insulin technology.  In the late 1970s, scientists began to produce human

insulin through recombinant technology.  By 1982, Eli Lilly brought the first recombinant human

insulins—Humulin R (regular) and N (NPH)—to the U.S. market.  Around the same time, Novo

and Nordisk developed methods for chemically converting bovine insulin into human insulin.

By 1988, a year prior to their merger, Novo and Nordisk obtained approval for their own

recombinant insulin.  This innovation allowed them to continue shared domination of the insulin

market with Eli Lilly.  It also enabled Eli Lilly and Novo Nordisk to spin a fresh web of insulin

patents, promising to stretch into the 21st century.

106.    After the introduction of human insulin, an improved understanding of the human

genetic code and recombinant technology put a third insulin advance within reach.  In the mid-

1980s, scientists began to modify the molecular structure of insulin, attempting to improve its

physiological effects.  By 1996, Eli Lilly had obtained approval for Humalog, the first rapid-

acting, man-made insulin.  This new type of insulin—known as an analog—allowed for

substantially faster absorption times.  Never far behind Eli Lilly, Novo Nordisk released its own

rapid-acting analog, Novolog, in 2000.  Four years after that, a third pharmaceutical company,

Sanofi-Aventis, released another rapid-acting analog, Apidra.

107.     The same technological advances that brought about rapid-acting analogs also

gave rise to long-acting analogs.  In 2000, Sanofi released the first long-acting analog.  This drug

was branded as Lantus.  Five years later, Novo Nordisk gained approval for its own long-acting

analog, Levemir.  The first patents on these long-acting analogs expired in June 2014, nearly a

century after Banting and Best's first patent application in 1923.

| Table 2: Insulin Available in the United States | | | | |
|---|---|---|---|---|
| **Insulin Type** | *Action* | *Brand Name* | *Generic Name* | *Company* |
| *Human* | **Rapid-acting** | Humulin R | Regular | Eli Lilly |
| | | Novolin R | Regular | Novo Nordisk |
| | **Intermediate** | Humulin N | NPH (isophane) | Eli Lilly |
| | | Novolin N | NPH (isophane) | Novo Nordisk |
| *Analogs* | **Rapid-acting** | Humalog | Lispro | Eli Lilly |
| | | Novolog | Aspart | Novo Nordisk |
| | | Apidra | Glulisine | Sanofi-Aventis |
| | **Long-Acting** | Lantus | Glargine | Sanofi-Aventis |
| | | Levemir | Detemir | Novo Nordisk |

C.      **Current Insulin Treatment Landscape**

108.     Today, analogs dominate the insulin market.  Doctors and patients prefer analogs

because they more closely mimic the way the human body naturally absorbs insulin released by

the pancreas.  As a result, it can be used in more flexible ways.

109.     The American Diabetes Association—the organization responsible for setting guidelines for diabetes care in the United States—recommends analogs for treatment of individuals with both type 1 and type 2 diabetes.

110.     For type 1 patients, insulin analogs are unquestionably the best course of treatment.  Doctors uniformly prescribe analogs for type 1 patients.

111.     For patients with type 2 diabetes, the American Diabetes Association describes long-acting analog insulin as the "most convenient initial insulin regimen."[36]  Nonetheless, the organization notes that type 2 patients without a history of hypoglycemia (a condition caused by a drop in blood sugar level) can safely use cheaper, human insulins.

112.     But doctors still prefer to prescribe analog insulins to type 2 patients.  A recent study found that as of 2010, among adults who filled more than one prescription for insulin, 91.5% filled prescriptions for insulin analogs.  The study found that percentage has grown considerably since 2000, when only 14.8% of patients (who filled more than one prescription for insulin) filled prescriptions for analog insulin.  Now, type 2 patients use human insulin less frequently:  the study found that only 14.8% of type 2 adults taking insulin filled a prescription for human insulin in 2010, down from 96.4% in 2000.  As one specialist has observed, "[h]uman insulin has become almost entirely obsolete in private clinical practice."[37]

---

[36] American Diabetes Association, *Approaches to Glycemic Care*, 38 Diabetes Care S52, S57 (2016), http://care.diabetesjournals.org/content/39/Supplement_1/S52?ijkey=07291605370b0a3e07418e06fb5e894fb4314f05&keytype2=tf_ipsecsha.

[37] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html?referrer=https://www.google.com/.

**Figure 7: Type of Insulin Use Among U.S. Adults with Type 2 Diabetes
(who filled more than one prescription)[38]**



113.    Last year, the top three selling insulins were all analogs:  Sanofi's long-acting Lantus garnered $6.98 billion in sales; Novo Nordisk's long-acting Novolog:  $3.03; and Eli Lilly's rapid-acting Humalog:  $2.84.

114.    In December 2016, a third long-acting analog entered the market:  Eli Lilly's Basaglar.  Basaglar is a follow-on product to Lantus.  However, it is not considered a generic drug because it did not rely on the Food, Drug, and Cosmetic Act's ("FDCA") Abbreviated New Drug Application pathway—the normal pathway to generic entry—for approval.  Instead, Basaglar was approved under a different FDCA pathway as a follow-on medication.

---

[38] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

**D.      Climbing Insulin Prices Unrelated to Any Rise in Production Costs**

115.    Despite the availability of a number of highly effective insulin drugs, too many people living with diabetes go without proper treatment for an all too familiar reason:  cost.

116.    Sanofi's benchmark price—also known as a sticker price—for Lantus, the top-selling analog insulin, now sits at about $250 per vial, up from about $115 in 2011.  The average diabetes patient needs one vial of insulin per month.  Therefore, Lantus costs an average patient about $250 per month if they buy at sticker price.  However, many patients need much more than one vial per month, so that cost can be much higher.

117.    Novo Nordisk's current benchmark price for Levemir is now about $280 per vial, up from about $90 in 2011.  Novo Nordisk's benchmark price for Novolog now sits at about $250 per vial, up from about $100 in 2011.  Thus, the average Levemir user spends about $280 per month and the average Novolog user spends $250 based on sticker price.

118.    Eli Lilly has raised the benchmark price of Humalog to about $255 per vial, more than double the 2011 price.  Thus, the average Humalog patient purchasing at benchmark price spends about $255 per month.

119.    But the benchmark prices of insulin analogs have not always been so high.  In just the last five years, Sanofi and Novo Nordisk have raised Lantus and Levemir's sticker prices an astounding 168% and 169%, respectively.[39]  In fact, last year, Novo Nordisk and Sanofi were responsible for the highest drug benchmark price increases in the *entire* industry.[40]  This distinction largely reflected their price hikes for Lantus and Levemir:  Sanofi and Novo Nordisk

---

[39] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep; Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html?referrer=https://www.google.com/.

[40] Credit Suisse Report.

raised the benchmark prices of those drugs by 30% over the course of 2014.[41]  Figure 8 shows

Sanofi, Novo Nordisk, and Eli Lilly's exponential benchmark price hikes from 2000 to 2015.

**Figure 8: Rapid Rising Insulin Benchmark prices from 2000-2015[42]**



120.    Sanofi, Novo Nordisk, and Eli Lilly have not only dramatically increased their

insulins benchmark prices in the last 10 years, they have done so in perfect lock-step.  In 13

instances since 2009, Sanofi and Novo Nordisk raised the benchmark prices of their long-acting

analog insulins, Lantus and Levemir, in tandem, "taking the same price increase down to the

decimal point within a few days of each other."[43]  As one healthcare analyst put it:  "That is

pretty much a clear signal that your competitor doesn't intend to price-compete with you."[44]  Eli

Lilly and Novo Nordisk have engaged in the same lock-step behavior with respect to their rapid-

acting analog insulins, Humalog and Novolog.  Figures 9 and 10 demonstrate this seemingly

---

[41] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep.

[42] Rebecca Robbins, *The Insulin Market is Heading for a Shakeup. But Patients May Not Benefit*, STAT (Oct. 14, 2016), https://www.statnews.com/2016/10/14/insulin-prices-generics/.

[43] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep.

[44] *Id.*

collusive behavior with respect to Lantus and Levemir; Figure 9 demonstrates this behavior with respect to Humalog and Novolog.

**Figure 9: Rising Lantus and Levemir Benchmark Prices from 2001-2015[45]**



---

[45] Lydia Ramsey, *A 93-year-old Drug that Can Cost more than a Mortgage Payment Tells Us Everything that's Wrong with American Healthcare*, Business Insider (Sept. 16, 2016), http://www.businessinsider.com/insulin-prices-increase-2016-9.

010646-11  932598 V1

**Figure 10: Sanofi and Novo Nordisk Increase Benchmark Prices in Lock-Step[46]**



**Figure 11: Eli Lilly and Novo Nordisk Increase Benchmark Prices in Lock-Step[47]**



---

[46] Robert Langreth, *Hot Drugs Show Sharp Price Hikes in Shadow Market*, Bloomberg (May 6, 2016), http://www.bloomberg.com/news/articles/2015-05-06/diabetes-drugs-compete-with-prices-that-rise-in-lockstep.

[47] Lydia Ramsey, *A 93-year-old Drug that Can Cost more than a Mortgage Payment Tells Us Everything that's Wrong with American Healthcare*, Business Insider (Sept. 16, 2016), http://www.businessinsider.com/insulin-prices-increase-2016-9.

010646-11  932598 V1

**E.      Collusive Competition:  The Real Reason for Sanofi and Novo Nordisk's Increasing Benchmark Prices**

121.     To an outside observer, Sanofi, Novo Nordisk, and Eli Lilly's behavior does not add up.  As direct market competitors, why have these companies raised their prices in lock step instead of undercutting each other's prices in the way firms do in normal competitive markets?

122.     In the past, Novo Nordisk maintained that their price increases reflected the "clinical benefit"[48] of their drugs.  But Lantus, Levemir, Novolog, and Humalog are the exact same drugs that they were 10 years ago—their clinical benefits have not changed.  Where clinical benefit has not changed, it cannot be used to justify a 169% price increase.  Therefore, another factor motivates these benchmark prices increases.

123.     The real reason Sanofi, Novo Nordisk, and Eli Lilly have not undercut each other's benchmark prices is because these firms are competing on a hidden index:  spread.  PBMs control the formularies that determine whether people living with diabetes will purchase Sanofi, Eli Lilly, or Novo Nordisk's drugs.  To secure a position on the PBMs' formularies, these companies have artificially inflated their list price.

124.     While this practice benefits both drug companies and PBMs, it harms consumers.  They shoulder the burden of the higher benchmark prices, paying more out-of-pocket for their insulins.

125.     Under pressure to explain its rising benchmark prices, Novo Nordisk admitted to this behavior in a recent press release.  On November 30, 2006, Novo Nordisk issued a press release stating:

> We hear from more and more people living with diabetes about the challenges they face affording healthcare, including the medicines we make. . . .  News reports on drug prices have left the public

---

[48] Allison Tsai, *The Rising Cost of Insulin*, Diabetes Forecast (Mar. 2016), *available at* http://www.diabetesforecast.org/2016/mar-apr/rising-costs-insulin.html?referrer=https://www.google.com/.

with an impression that companies like ours realize all the profits from the "[benchmark] price" increases we've made over the last decade. In other words, a [benchmark] price increase by **XX percent leads to an automatic XX percent profit** for the drug maker. We believe that is misleading and here's why: As the manufacturer, we do set the "[benchmark] price" and have full accountability for those increases. However, after we set the [benchmark] price, we negotiate with the companies that actually pay for the medicines, which we call payers. This is necessary in order for our medicines to stay on their preferred drug list or formulary. The price or profit we receive after rebates, fees and other price concessions we provide to the payer is the "net price." The net price more closely reflects our actual profits.[49]

Explaining the company's benchmark price increases, Novo Nordisk directly admitted that it "set[s] [benchmark] price" with an eye to achieving "preferred" formulary status.

126.    Eli Lilly, too, has admitted that it raises benchmark prices as a *quid pro quo* for formulary positions: "The reason drugmakers sharply raise benchmark prices without a corresponding increase in net price is that PBMs demand higher rebates in exchange for including the drug on their preferred-drug lists."[50]

127.    But these explanations omit a crucial detail: drug companies could offer PBMs the same high rebates in a manner that would help consumers: they could lower their real prices, instead of inflating benchmark price. Increasing spreads in this manner would benefit consumers. Yet the insulin manufacturers refuse to significantly lower their real prices, and the PBMs continue to accept this behavior so long as benchmark prices continue to rise while real prices stay constant.

---

[49] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[50] Denise Roland & Peter Loftus, *Middlemen Fuel Insulin Price Rise*, Wall St. J., Oct. 10, 2016, at B1.

128.   In furtherance of this scheme, Novo Nordisk has steeply raised the benchmark

prices of Levemir and Novolog while keeping the real prices of these drugs constant.  Figures 12

and 13—included in Novo Nordisk's press release—illustrate this conduct.

**Figure 12: Novolog Vial Real Versus Benchmark price Increases[51]**



**Figure 13: Novolog FlexPen[52] Real Versus Benchmark price increases[53]**



---

[51] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[52] The FlexPen is a type of insulin injection.  Patients who use this pen stick themselves with a pen-like insulin distributor instead of injection insulin through a pump.

[53] *Id.*

129.    Overall, the sales-weighted net prices for the long-acting insulins fell 12% in 2016.  Figure 14 illustrates this phenomenon.

**Figure 14: Difference between Benchmark and Net Price for Long-Acting Insulins from 2008-2016[54]**



130.    Sanofi, Novo Nordisk, and Eli Lilly's spread-increasing behavior is also visible from data on these companies' rebates to PBMs and insurers.  The two figures below illustrate Novo Nordisk's rebates from 2007 to 2014.

---

[54] Richard Evans, Scott Hinds, & Ryan Baum, *US Rx Net Pricing Trends Thru 2Q16*, SSR LLC, 36 (Oct. 5, 2016).

**Figure 15: Novo Nordisk's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014[55]**



**Figure 16: Novo Nordisk's Selling, General, and Administrative Costs and Rebates as a Percentage of Gross U.S. Sales from 2007-2014[56]**



---

[55] Jeffrey Balin, et al., *Global Pharma: Rising US Rebates Limit Margin Expansion*, Credit Suisse, 23 (May 1, 2015).

[56] *Id.*

131.    Sanofi has also greatly increased its spreads.  Figures 17 and 18 show the amount Sanofi has increased its rebates (spreads) from 2007 to 2014.

**Figure 17: Sanofi's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014[57]**



**Figure 18: Sanofi's Selling, General, and Administrative Costs and Rebates as a Percentage of Gross U.S. Sales from 2007-2014[58]**



---

[57] *Id.* at 26.

[58] *Id.*

- 47 -

132.    Finally, Eli Lilly has greatly increased its spreads.  Figures 19 and 20 show the amount Eli Lilly has increased its rebates (spreads) from 2007 to 2014.

**Figure 19: Eli Lilly's Reported Rebates as a Percentage of U.S. Gross Sales from 2007-2014[59]**



Source: Company data, Credit Suisse estimates

**Figure 20: Eli Lilly's Selling, General, and Administrative Costs and Rebates as a Percentage of Gross U.S. Sales from 2007-2014[60]**



Source: Company data, Credit Suisse estimates

---

[59] *Id.* at 17.

[60] *Id.*

133.     Sanofi and Novo Nordisk have stretched the spreads on their analog insulin medications to the point where they have become the second and third largest rebators in the entire pharmaceutical industry.  In an industry where artificial benchmark prices inflation has become common, Sanofi, Novo Nordisk, and Eli Lilly are three of the worst offenders.

134.     Over the last 10 years, diabetes patients who need analog insulins have been paying higher and higher benchmark prices for Lantus, Levemir, Novolog, and Humalog.  But, in reality, the real prices of these medications to PBMs are staying constant (and even slightly dropping).  The vast majority of diabetes patients have no idea that the benchmark prices they struggle to afford are not only different from the prices PBMs and insurers receive, but actually trend in entirely different direction.  As the benchmark prices of Lantus, Levemir, Novolog, and Humalog slide further and further away from their real, net prices, these benchmark prices become so misrepresentative, so untethered from the reality as to be fraudulent.  And while this practice enables Sanofi, Novo Nordisk, and Eli Lilly to offer larger rebates to some PBMs (and, as a result, insurers), it does so at the price of access.  The uninsured and underinsured—by definition, some of the most vulnerable populations in the United States—cannot afford the artificial prices that Sanofi, Novo Nordisk, and Eli Lilly offer.

**F.     The Economic Effect of Sanofi, Novo Nordisk, and Eli Lilly's Price Increases on Patients**

135.     As previously explained, Sanofi, Novo Nordisk, and Eli Lilly's price hikes have hit a number of patient groups particularly hard—the uninsured, those with high deductibles, those with high coinsurance rates, and those who hit the Medicare Part D Donut Hole.

136.     Currently, 150 million Americans get healthcare insurance through their employers.  Increasingly, individuals within this group are unable to afford their prescribed insulins due to the cost-sharing obligations their health plans impose.  A 2014 study found that

among patients with commercial insurance, out-of-pocket costs for people with type 2 diabetes rose a staggering 89% from 2000 to 2010.[61]

137.     In fact, patients with endocrine disorders, such as diabetes, are more likely to shoulder out-of-pocket costs in excess of $1,000 than patients *in any other disease class*.  As Figure 21 illustrates, 70% of people with endocrine disorders have out-of-pocket drug spending at or above $1,000.

**Figure 21: Conditions that are more Likely to Lead to High Out-of-Pocket Spending[62]**



---

[61] Kasia Lipska, et al., *Use and Out-of-Pocket Costs of Insulin for Type 2 Diabetes Mellitus from 2000 to 2010*, 311 J. Am. Med. Ass'n 2331, 2332 (2014).

[62] Cynthia Cox, et al., *Examining High Prescription Drug Sending for People with Employer Sponsored Health Insurance*, Kaiser Family Foundation (Oct. 27, 2016), http://www.healthsystemtracker.org/insight/examining-high-prescription-drug-spending-for-people-with-employer-sponsored-health-insurance/.

138.    The increasing number of patients with high-deductible plans and coinsurance obligations, together with the rise in coinsurance rates, has made the pain associated with the Lantus, Levemir, Humalog, and Novolog price hikes particularly acute.  Although insulin has been available for over 100 years, Sanofi, Novo Nordisk, and Eli Lilly's price hikes are now making it harder than ever to obtain.[63]

## G.      The Real Impact of Artificial Pricing

139.    For many Plaintiffs and Class members, Sanofi, Novo Nordisk, and Eli Lilly's artificial price inflation has cost them their health, financial stability, and emotional wellbeing. Unable to afford Sanofi, Novo Nordisk, and Eli Lilly's price increases, many patients have begun to engage in highly risky behaviors with respect to their disease.  Plaintiffs report under-dosing their insulin, skipping their refills, injecting expired insulin, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, forgo one or even two meals a day.  These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness.  One class member with type 1 diabetes has been unable to afford the Levemir her doctor prescribes and has been taking human insulin instead.  The human insulin, however, does not effectively control her blood sugar levels and she has been progressive loosing feeling in her foot.  She worries she may eventually lose it if she does not find a way to obtain Levemir at a lower cost.  Ineffective control of blood sugar can also cause sustained hyperglycemia and, in severe cases, diabetic ketoacidosis, which can be life-threatening.  Other Plaintiffs explain that their insulin costs have left them unable to afford the

---

[63] The Affordable Care Act sets a limit for patient out-of-pocket spending.  For 2017, the Affordable Care Act has capped out-of-pocket costs at $6,550 for individuals and $13,100 for families.  Nevertheless, for many low- and middle-income individuals and families, these ceilings provide little relief—many cannot afford to hit them.

healthy diets they should be maintaining.  While analog insulin should be improving the health

of Plaintiffs, Defendants' price hikes have had led to the opposite effect.

140.    But the toll of Defendants' price hikes is not just physical:  the high cost of insulin

causes serious financial difficulty and emotional stress.  Multiple class members spend over 50%

of their income on their insulin drugs.  Plaintiffs describe going into debt, taking out loans,

moving back in with their parents, and quitting school to pay for their insulin.  One Plaintiff

stated that she often turns off the lights and lowers the heat in her house, attempting to keep her

electrical bill as low as possible so she can afford her insulin.  The stress of this financial burden

is all consuming:  many Plaintiffs describe a constant state of anxiety brought on by their

inability to afford the rising insulin prices.

141.    PBMs and insurers claim that their scheme of discounts and rebates ultimately

benefits plan enrollees by providing them with lower drug costs.  Even assuming that some part

of the discounts does reach insured patients (after the PBMs and insurers have both taken their

cuts), these discounts are never redistributed to uninsured patients.  It also does not come back to

under-insured patients—those in plans with high deductibles and coinsurance obligations—who

must pay much of their prescription drug costs out-of-pocket.  Many patients cannot afford to hit

their deductibles year after year.  They must begin to ration their insulin before they hit their

deductibles and their insurers begin to kick in for their insulin costs.

142.    Cognizant of the damage increasing benchmark prices have inflicted on patients,

Novo Nordisk and Eli Lilly have recently announced that they will take steps, going forward, to

rein in this harm.  In its November 30, 2016 press release, Novo Nordisk made a modest

commitment to "limit[] any potential future benchmark price increases for our medicines to no

more than single-digit percentages annually."[64]   On December 13, 2016, Eli Lilly announced

that, starting on January 1,[65] patients who pay full-retail prices out of pocket for Eli Lilly's

insulin will gain access to 40% discounts on their Eli Lilly's insulins.[66]

143.    Long overdue, these affordability measures still do not end or even address the

insidious practice of competing for PBM business based on the spread between benchmark and

net price.  Nor do they make whole the patients who have spent thousands of dollars out-of-

pocket on long acting insulins for the past few years.  Therefore, these measures fail to address

the structural issues that have given rise to the price hikes that have hurt under-insured and

uninsured diabetes patients for years.

144.    Individuals living with diabetes spend, on average, twice as much as those

without the disease despite the fact that treatment for the disease has existed for over 100 years.

Diagnosed diabetes now costs the United States over $245 billion per year:  an estimated $1 of

every $5 spent on health care in the United States.  Sanofi, Novo Nordisk, and Eli Lilly's

artificial inflation of insulin analog prices has pushed and will continue to push access to life-

saving drugs out of reach of uninsured and underinsured American diabetes patients, even

despite recent efforts to control prices.  Without access to proper treatment, diabetes patients

experience serious and costly health complications.  Despite the efforts of the original insulin

innovators to ensure the drug was widely accessible, the pharmaceutical companies that have

inherited their legacy have eschewed this aspiration, sublimating it to the companies' profit

margins.  The fraudulent practice of creating a large spread between benchmark and real prices

has harmed and will continue to harm diabetes patients across the country.  Millions more will

---

[64] Novo Nordisk Press Release (Nov. 30, 2016), http://press.novonordisk-us.com/leadership-perspectives?item=1.

[65] Eli Lilly Press Release (Dec. 13, 2016), https://investor.lilly.com/releasedetail.cfm?ReleaseID=1003887.

[66] *Id.*

suffer painful complications and early death unless Sanofi, Novo Nordisk, and Eli Lilly make analog insulin more affordable.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

145.   Plaintiffs and Class members had no way of knowing about Defendants' scheme and deception with respect to insulin pricing.

146.   PBM's refuse to disclose the real costs of insulin, labeling them trade secrets, hence a reasonable plaintiff and consumer could not discover the truth.

147.   Within the time period of any applicable statutes of limitation, Plaintiffs and members of the proposed class could not have discovered through the exercise of reasonable diligence that Defendants were concealing the conduct complained of herein and misrepresenting the true cost of insulin.

148.   Plaintiffs and the other Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Defendants were engaged in the scheme and were publishing phony benchmark prices, nor would reasonable and diligent investigation have disclosed the true facts.

149.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

### B.   Fraudulent Concealment Tolling

150.   All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

**C.      Estoppel**

151.    Defendants were under a continuous duty to disclose to Plaintiffs and Class

members the true character, quality, and nature of the benchmark prices upon which their

payments for insulin were based.

152.    Based on the foregoing, Defendants are estopped from relying on any statutes of

limitations in defense of this action.

## VII.    CLASS ACTION ALLEGATIONS

153.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

under Federal Rule of Civil Procedure 23(a) and (b)(3), as representatives of a class defined as

follows:

> All persons in the United States and its territories who paid any
> portion of the purchase for a prescription of Lantus, Levemir,
> Novolog, and/or Humalog at a price calculated by reference to a
> benchmark price, such as AWP (Average Wholesale Price).  The
> class period is four years from the date of the filing of this
> complaint.

Excluded from the class are:  (a) Sanofi and any entity in which it has a controlling interest, and

their legal representatives, officers, directors, assignees, and successors; (b) Novo Nordisk and

any entity in which it has a controlling interest, and their legal representatives, officers, directors,

assignees, and successors; (c) Eli Lilly and any entity in which it has a controlling interest, and

their legal representatives, officers, directors, assignees, and successors; and (d) any co-

conspirators, and their officers, directors, management, employees, subsidiaries, and affiliates.

154.    There are a number of ways in which a person may pay a portion of the purchase

price of Lantus, Levemir, Novolog, and/or Humalog and thereby gain inclusion in the class.

First, a person may be uninsured and, therefore, responsible for paying 100% of the cost of her

prescription needs (the "uninsured scenario").  Second, a person's insurance plan may require

her to satisfy a deductible before insurance benefits cover all or a portion of their prescription needs. If so, that person is paying for 100% of the cost of any prescriptions filled before the deductible is met (the "deductible scenario"). Third, a person may have a coinsurance requirement—an obligation to a portion of any prescription or medical benefit that they purchase, which is expressed as a percentage of the cost of the medication or service provided (the "coinsurance scenario"). If so, she would be responsible for paying for a portion of the Lantus, Levemir, Novolog, and/or Humalog purchase, consistent with the terms of her plan. Fourth, a person may obtain insurance through a Medicare Part D Plan; if so, there is a coverage gap, often referred to as the "Donut Hole" (the "Donut Hole scenario"). Once that person and her plan has spent a stated amount of money on prescription drugs, the person becomes responsible for 40% of the cost of her brand-name prescriptions until her total annual out-of-pocket expenses reaches the next stated benchmark amount. After this benchmark, her plan covers the majority of her drug costs again. All of these individuals qualify as direct purchasers.

155.    In each of these scenarios—the uninsured scenario, the deductible scenario, the coinsurance scenario, and the Donut Hole scenario—a person's out-of-pocket expenses for Lantus, Levemir, Novolog, and/or Humalog are determined by the benchmark prices of these drugs. Accordingly, each falls within the class definition.

156.    Members of the class are so numerous and geographically dispersed that joinder of all members is impracticable. Hundreds of thousands of prescriptions are written for Lantus, Levemir, Novolog, and Humalog throughout the United States every week, and these prescriptions are filled by hundreds of thousands of individuals. The class is readily identifiable from information and records in Sanofi, Novo Nordisk, and Eli Lilly's possession.

157.     Plaintiffs' claims are typical of the claims of the members of the class.  Plaintiffs and all members of the class were damaged by the same wrongful conduct of Defendants—*i.e.*, as a result of Sanofi, Novo Nordisk, and Eli Lilly's misconduct, these purchasers paid artificially-inflated prices for Lantus, Levemir, Novolog, and/or Humalog.

158.     Plaintiffs will fairly and adequately protect and represent the interests of the class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the class.

159.     Counsel that represent Plaintiffs are experienced in the prosecution of class action antitrust litigation and have particular experience with class action antitrust litigation involving pharmaceutical products and extensive experience in class actions including the use of benchmark pricing, including two cases in the district (AWP and McKesson) that resulted in recovery in excess of $500 million.

160.     Questions of law and fact common to the members of the class predominate over questions that may affect only individual class members because Defendants have acted on grounds generally applicable to the entire class, thereby making overcharge damages with respect to the class as a whole appropriate.  Such generally applicable conduct is inherent in Defendants' wrongful conduct.

161.     Questions of law and fact common to the class include:

    i.    Whether the benchmark price set by Sanofi, Novo Nordisk, or Eli Lilly is used as a benchmark for payments by class members;

    ii.    What the benchmark price for Lantus, Levemir, Novolog, and Humalog is;

    iii.    Whether Sanofi, Novo Nordisk, and Eli Lilly are engaged in a course of conduct that improperly inflated the benchmark-to-real price ratio and the ultimate benchmark price used by Plaintiffs and class members as a basis for reimbursement;

    iv.    Whether Defendants artificially inflated the benchmark price;

v.    Whether Defendants gave rebates to PBMs that created substantial spreads between the benchmark price and PBM negotiated price;

vi.    Whether the large spread between these prices benefitted the PBMs;

vii.    Whether the large benchmark-to-real price spread was intended to induce the PBMs to give Lantus, Levemir, Novolog, and/or Humalog favorable placement on the PBMs' formularies;

viii.    Whether the large spread did induce the PBMs to give Defendants favorable placement on the PBMs' formularies;

ix.    Whether each Defendant conspired with the PBMs from the Pricing Enterprise for the purpose of carrying out its pricing fraud;

x.    Whether Defendants conducted, or participated in the conduct of, the Pricing Enterprise;

xi.    Whether Defendants or the PBMs engaged in mail or wire fraud in furtherance of the Pricing Enterprise;

xii.    Whether Defendants engaged in a pattern and practice that caused Plaintiffs and class members to make inflated payments for Lantus, Levemir, Novolog, and/or Humalog;

xiii.    Whether Defendants engaged in deceptive fraudulent conduct;

xiv.    Whether Defendants' deceptive and/or fraudulent activity was intended to defraud or harm Plaintiffs and class members;

xv.    Whether Defendants' conduct violated RICO or the State Consumer Protection Statute; and

xvi.    Whether Defendants are liable to Plaintiffs and the class members for damages flowing from their misconduct.

162.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured

persons or entities a method for obtaining redress on claims that could not practicably be pursued

individually, substantially outweighs potential difficulties in management of this class action.

163.    Plaintiffs know of no special difficulty to be encountered in the maintenance of

this action that would preclude its maintenance as a class action.

## VIII.   CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*

164.    Plaintiffs Chaires, Jane Doe, Gilleland, Girard, Hasselbach, McLaughlin, and

Wofford hereby incorporate by reference the allegations contained in the preceding paragraphs

of this complaint.

165.    This claim is brought on behalf of the class against Sanofi for actual damages,

treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962,

*et seq.*

166.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18

U.S.C. § 1962(c).

167.    Plaintiffs and the members of the class are each "persons," as that term is defined

in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Sanofi's

wrongful conduct.

### A.      The Lantus Pricing Enterprise

168.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact

that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

169.     Sanofi formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Lantus Pricing Enterprise.  The Lantus Pricing Enterprise consists of (a) Sanofi, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

170.     The Lantus Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose:  to secure an exclusive, or at least favorable, formulary position for Sanofi's long-acting analog insulin product, Lantus, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

171.     To accomplish this purpose, the Lantus Pricing Enterprise periodically and systematically inflated the benchmark price of Lantus and represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers, including Plaintiffs and the class, that Lantus' benchmark price fairly and accurately reflected the actual cost of this drug.  The Lantus Pricing Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and the class members, the existence and amount of steep rebates Sanofi gave to the PBMs.  These rebates were worth at least 25% of the benchmark price.  The Lantus Pricing Enterprise also concealed from the public the purpose of these rebates:  The difference between the benchmark price and the real price of Lantus negotiated by the PBMs resulted in increased profits for the PBMs.  These large rebates served to ensure that the PBMs would place, and maintain, Lantus in a preferred or favorable position on the PBMs' formularies.

By securing a favorable position on the formulary, the Lantus Pricing Enterprise ensured that a larger number of Lantus prescriptions would be written and filled. This scheme translated into higher sales (and therefore profits) for Sanofi and larger spreads for the PBMs.

172. The persons engaged in the Lantus Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Sanofi. There is regular communication between Sanofi and each of the PBMs, in which information is shared. Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Sanofi and the PBMs share information regarding the Lantus benchmark price and discuss and agree on rebate amounts. Sanofi and the PBMs functioned as a continuing unit for the purposes of implementing the Lantus pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

173. At all relevant times, CVS Caremark was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct. CVS Caremark struck rebate deals with Sanofi to conceal the true price of Lantus and profit from the inflated rebates. CVS Caremark represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs. But it knew that the rebates did not actually decrease the cost of Lantus for consumers, because the published benchmark price was falsely inflated. CVS Caremark also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers. But for the Lantus Pricing Enterprise's unlawful fraud, CVS Caremark would have had the incentive to disclose the deceit by Sanofi, thereby forcing competition on real price. By failing to disclose

this information, CVS Caremark perpetuated the Lantus Pricing Enterprise's scheme, and reaped substantial profits.

174.    At all relevant times, Express Scripts was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  Express Scripts struck rebate deals with Sanofi to conceal the true price of Lantus and profit from the inflated rebates.  Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the cost of Lantus for consumers, because the published benchmark price was falsely inflated.  Express Scripts also knew, but did not disclose, that the other PBMs—CVS Caremark and OptumRx— were engaged in the same rebating scheme, to the detriment of consumers.  But for the Lantus Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, Express Scripts perpetuated the Lantus Pricing Enterprise's scheme, and reaped substantial profits.

175.    At all relevant times, OptumRx was aware of Sanofi's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  OptumRx struck rebate deals with Sanofi to conceal the true price of Lantus and profit from the inflated rebates.  OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the cost of Lantus for consumers, because the published benchmark price was falsely inflated.  OptumRx also knew, but did not disclose, that the other PBMs—CVS Caremark and Express Scripts—were engaged in the same

rebating scheme, to the detriment of consumers.  But for the Lantus Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, OptumRx perpetuated the Lantus Pricing Enterprise's scheme, and reaped substantial profits.

176.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Sanofi's reported benchmark prices, terminate their role in the Lantus Pricing Enterprise, nor disclose publicly that the Lantus benchmark price did not accurately reflect the price actually paid for the drug.

177.    CVS Caremark, Express Scripts, and OptumRx participated in the conduct of the Lantus Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary position for Lantus, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.  The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.    The actual price of Lantus;

b.    The extent to which the actual price of Lantus departed from the published, artificially-inflated benchmark price;

c.    The extent to which Sanofi and the PBMs had negotiated the rebates discounting the benchmark price of Lantus in good faith and for a proper purpose;

d.    Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.       Whether the rebates saved health care payers, plan members, and the general public money;

f.       Whether Lantus' "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.       Whether Lantus would have been placed in a "preferred" formulary position absent the rebates; and

h.       The extent to which the rebating scheme would force plan members to incur additional expenses for their Lantus prescriptions.

178.    Sanofi alone could not have accomplished the purpose of the Lantus Pricing Enterprise, without the assistance of the PBMs.  For Sanofi to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Lantus was given favorable treatment.  And the PBMs did so through misrepresentations:  they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because the benchmark prices were artificially inflated. The discounts were fictitious:  the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Lantus Pricing Enterprise could not have achieved its common purpose.

179.    The Lantus Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

180.    The impacts of the Lantus Pricing Enterprise's scheme are still in place—*i.e.*, the increased spread between the Lantus benchmark price and the actual price of Lantus is still being

maintained, and increased.  Consequently, PBMs and pharmacies make a profit on the spread

between benchmark price and the actual acquisition cost—*i.e.*, the rebates.  Under this system, a

higher spread results in increased profits to PBMs and pharmacies.

181.    The foregoing evidenced that Sanofi, CVS Caremark, Express Scripts, and

OptumRx were each willing participants in the Lantus Pricing Enterprise, had a common purpose

and interest in the object of the scheme, and functioned within a structure designed to effectuate

the Enterprise's purpose, *i.e.*, through Sanofi's artificial inflation of the Lantus benchmark price,

coupled with Sanofi's and the PBMs' creation of substantial rebates, and the PBMs'

misstatements to the drug-purchasing public that those rebates benefitted health care payer and

consumers like Plaintiffs and the class.

## B.    Conduct of the Lantus Pricing Enterprise

182.    During the class period, Sanofi exerted control over the Lantus Pricing Enterprise

and participated in the operation or management of the affairs of the Lantus Pricing Enterprise,

directly or indirectly, in the following ways:

    a.    Sanofi selected and published the Lantus benchmark price;

    b.    Sanofi periodically raised the published Lantus benchmark price;[67]

    c.    Sanofi granted to the PBMs substantial rebates representing discounts off

of the Lantus benchmark price in exchange for the PBMs' promise to give Lantus exclusive or at

least favorable, formulary placement;

    d.    Sanofi concealed from the public the amount and purpose of the rebates;

---

[67] *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

e.      Sanofi intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

f.      The public, through stating of Lantus' benchmark price without stating that the benchmark price differed substantially from that negotiated by PBMs, that the Lantus benchmark price reflected or approximated Lantus' actual cost.

183.    The scheme had a hierarchical decision-making structure that was headed by Sanofi.  Sanofi controlled the Lantus benchmark price, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Lantus would receive exclusive, or at least favorable, formulary placement.

184.    The PBMs also participated in the conduct of the affairs of the Lantus Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on Lantus exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Lantus) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

185.    The scheme devised and implemented by Sanofi, as well as other members of the Lantus Pricing Enterprise, amounted to a common course of conduct intended to (a) secure

- 66 -

favorable formulary positioning for Lantus; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Lantus written by plan members' physicians.

## C.      Sanofi's Pattern of Racketeering Activity

186.     Sanofi conducted and participated in the conduct of the affairs of the Lantus Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Lantus Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Lantus pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Sanofi and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

187.     Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  Sanofi and the PBMs calculated and intentionally crafted the Lantus pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for Lantus.  In designing and implementing the scheme, at all times Sanofi was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting benchmark prices and establishing rebates.

188.    By intentionally and artificially inflating the Lantus benchmark price, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Sanofi and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

189.    Sanofi's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Sanofi was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class.  Sanofi has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Lantus Pricing Enterprise.

190.    The pattern of racketeering activity alleged herein and the Lantus Pricing Enterprise are separate and distinct from each other.  Likewise, Sanofi is distinct from the Lantus Pricing Enterprise.

191.    The pattern of racketeering activity alleged herein is continuing as of the date of this complaint, and, upon information and belief, will continue into the future unless enjoined by this Court.

**D.     Sanofi's Use of the U.S. Mail and Interstate Wire Facilities**

192.    The Lantus Pricing Enterprise engaged in and affected interstate commerce because it engaged in the following activities across state boundaries:  the transmission and publication of false and misleading information concerning the Lantus benchmark price; the payment from Sanofi to the PBMs of substantial rebates off of the benchmark price; and transmission of false or incomplete statements intended to mislead health care payers and consumers regarding the existence, amount, and purpose of the rebates.

193.    During the class period, the Lantus Pricing Enterprise's unlawful conduct and wrongful practices were carried out by an array of employees, working across state boundaries, who necessarily relied upon frequent transfers of documents, information, products, and funds by the U.S. Mail and interstate wire facilities.

194.    The nature and pervasiveness of the Lantus pricing fraud scheme, which was orchestrated out of the corporate headquarters of Sanofi and each PBM, necessarily required those headquarters to communicate directly and frequently by U.S. Mail and interstate wire facilities.

195.    Many of the precise dates of the Lantus Pricing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to Sanofi's, CVS Caremark's, Express Scripts's, and OptumRx's books and records.  Indeed, an essential part of the successful operation of the Lantus Pricing Enterprise alleged herein depended upon secrecy.  However, Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs describe this below.

196.    Sanofi's use of the U.S. Mail and interstate wire facilities to perpetrate the Lantus pricing fraud scheme involved thousands of communications throughout the class period including, *inter alia*:

    a.      Marketing materials about Sanofi's Lantus product and its price, which Sanofi sent to health care payers and health care providers located across the country;

b.      Written communications between Sanofi and the publishers of benchmark price compendia regarding the Lantus benchmark price and its subsequent mark-ups, which occurred on a regular basis each year;

c.      Written representations and telephone calls between Sanofi and CVS Caremark regarding Lantus markups and benchmark price;

d.      Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus markups and benchmark price;

e.      Written representations and telephone calls between Sanofi and OptumRx regarding Lantus markups and benchmark price;

f.      Written representations and telephone calls between Sanofi and CVS Caremark regarding Lantus rebates;

g.      Written representations and telephone calls between Sanofi and Express Scripts regarding Lantus rebates;

h.      Written representations and telephone calls between Sanofi and OptumRx regarding Lantus rebates;

i.      Hundreds of e-mails between Sanofi and the PBMs agreeing to or effectuating the implementation of the Lantus pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Lantus benchmark price was; the existence, amount, or purpose of the Lantus rebates; and the true cost of Lantus that were designed to conceal the scheme, deter investigations into Lantus pricing, or forestall changes to healthcare payers reimbursement of Lantus prescriptions based on something other than the Lantus benchmark price; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

197.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Sanofi that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and class members.

**E.      Damages Caused by Sanofi's Lantus Pricing Fraud**

198.    Sanofi's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for Lantus.

199.    As described above, when a healthcare consumer fills a prescription for a drug like Lantus, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

200.    The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Sanofi, through the Lantus Pricing Enterprise, artificially inflates the Lantus benchmark price, it also artificially inflates the consumers' out-of-pocket expenses.

201.    Plaintiffs' injuries, and those of the class members, were proximately caused by Sanofi's racketeering activity.  But for the misstatements made by Sanofi and the PBMs and the pricing scheme employed by the Lantus Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Lantus expenses.

202.    Plaintiffs' injuries were directly caused by Sanofi's racketeering activity.  Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the Lantus Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

203.    And although the Lantus Pricing Enterprise was effectuated to give Sanofi a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Sanofi's competitors.

204.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Sanofi's fraudulent scheme.

205.    By virtue of these violations of 18 U.S.C. § 1962(c), Sanofi is liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT TWO

## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*

206.    Plaintiffs Denault, Hasselbach, and Teachman, hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

207.    This claim is brought on behalf of the class against Novo Nordisk for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

208.    Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

209.    Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Novo Nordisk's wrongful conduct.

### A.    The Levemir/Novolog Pricing Enterprise

210.    Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

211.    Novo Nordisk formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Levemir/Novolog Pricing Enterprise.  The Levemir/Novolog Pricing Enterprise consists of (a) Novo Nordisk, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts,

including its employees and agents; and (d) the PBM OptumRx, including its employees and

agents.

212.    The Levemir/Novolog Pricing Enterprise is an ongoing and continuing business

organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and

maintained systematic links for a common purpose:  to secure an exclusive, or at least favorable,

formulary position for Novo Nordisk's long-acting analog insulin product, Levemir, and its

rapid-acting analog insulin product, Novolog, as a treatment for type 1 and 2 diabetes to the

exclusion or detriment of competitor products and consumers.

213.    To accomplish this purpose, the Levemir/Novolog Pricing Enterprise periodically

and systematically inflated the benchmark prices of Levemir and Novolog and represented—

either affirmatively or through half-truths and omissions—to the general public, health care

payers, and consumers, including Plaintiffs and the class, that Levemir and Novolog' s

benchmark prices fairly and accurately reflected the actual cost of this drug.  The Enterprise

concealed from the public, health care payers, and consumers, like Plaintiffs and the class

members, the existence and amount of steep rebates Novo Nordisk gave to the PBMs.  These

rebates were worth at least 25% of the benchmark price.  The Levemir/Novolog Pricing

Enterprise also concealed from the public the purpose of these rebates:  The difference between

the benchmark price and the real prices of Levemir and Novolog negotiated by the PBMs

resulted in increased profits for the PBMs.  These large rebates served to ensure that the PBMs

would place, and maintain, Levemir and Novolog in a preferred or favorable position on the

PBMs' formularies.  By securing a favorable position on the formulary, the Levemir/Novolog

Pricing Enterprise ensured that a larger number of Levemir and Novolog prescriptions would be

written and filled.  This scheme translated into higher sales (and therefore profits) for Novo Nordisk and larger spreads for the PBMs.

214.    The persons engaged in the Levemir/Novolog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Novo Nordisk.  There is regular communication between Novo Nordisk and each of the PBMs, in which information is shared.  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Novo Nordisk and the PBMs share information regarding the Levemir and Novolog benchmark prices and discuss and agree on rebate amounts.  Novo Nordisk and the PBMs functioned as a continuing unit for the purposes of implementing the Levemir and Novolog pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

215.    At all relevant times, CVS Caremark was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  CVS Caremark struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates.  CVS Caremark represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the costs of Levemir and Novolog for consumers, because the published benchmark price was falsely inflated.  CVS Caremark also knew, but did not disclose, that the other PBMs—Express Scripts and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers.  But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, CVS Caremark would have had the incentive to disclose the deceit by Novo Nordisk, thereby forcing

competition on real price.  By failing to disclose this information, CVS Caremark perpetuated the Levemir/Novolog Pricing Enterprise's scheme, and reaped substantial profits.

216.    At all relevant times, Express Scripts was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  Express Scripts struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates.  Express Scripts represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the costs of Levemir and Novolog for consumers, because the published benchmark price was falsely inflated.  Express Scripts also knew, but did not disclose, that the other PBMs—CVS Caremark and OptumRx—were engaged in the same rebating scheme, to the detriment of consumers.  But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, Express Scripts perpetuated the Levemir/Novolog Pricing Enterprise's scheme, and reaped substantial profits.

217.    At all relevant times, OptumRx was aware of Novo Nordisk's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  OptumRx struck rebate deals with Novo Nordisk to conceal the true prices of Levemir and Novolog and profit from the inflated rebates.  OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the costs of Levemir and Novolog for consumers, because the published benchmark price was falsely inflated.  OptumRx also knew, but did not disclose, that the other PBMs—CVS Caremark

and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers. But for the Levemir/Novolog Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage. By failing to disclose this information, OptumRx perpetuated the Levemir/Novolog Pricing Enterprise's scheme, and reaped substantial profits.

218.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Novo Nordisk's reported benchmark prices, terminate their role in the Levemir/Novolog Pricing Enterprise, nor disclose publicly that the Levemir and Novolog benchmark prices did not accurately reflect the price actually paid for the drugs.

219.    CVS Caremark, Express Scripts, and OptumRx participated in the conduct of the Levemir/Novolog Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary positions for Levemir and Novolog, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.  The PBMs knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.    The actual prices of Levemir and Novolog;

b.    The extent to which the actual prices of Levemir and Novolog departed from the published, artificially-inflated benchmark prices;

c.    The extent to which Novo Nordisk and the PBMs had negotiated the rebates discounting the benchmark prices of Levemir and Novolog in good faith and for a proper purpose;

d.      Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.      Whether the rebates saved health care payers, plan members, and the general public money;

f.      Whether Levemir and Novolog's "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.      Whether Levemir and Novolog would have been placed in a "preferred" formulary position absent the rebates; and

h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Levemir and Novolog prescriptions.

220.    Novo Nordisk alone could not have accomplished the purpose of the Levemir/Novolog Pricing Enterprise, without the assistance of the PBMs.  For Novo Nordisk to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Levemir and Novolog were given favorable treatment.  And the PBMs did so through misrepresentations:  they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because the benchmark prices were artificially inflated.  The discounts were fictitious:  the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Levemir/Novolog Pricing Enterprise could not have achieved its common purpose.

221.    The Levemir/Novolog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands

of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

222.    The impacts of the Levemir/Novolog Pricing Enterprise's scheme are still in place—*i.e.*, the increased spread between the Levemir and Novolog benchmark prices and the actual prices of Levemir and Novolog is still being maintained, and increased.  Consequently, PBMs and pharmacies make a profit on the spread between benchmark price and the actual acquisition cost—*i.e.*, the rebates.  Under this system, a higher spread results in increased profits to PBMs and pharmacies.

223.    The foregoing evidenced that Novo Nordisk, CVS Caremark, Express Scripts, and OptumRx were each willing participants in the Levemir/Novolog Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Novo Nordisk's artificial inflation of the Levemir and Novolog benchmark prices, coupled with Novo Nordisk's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the class.

**B.      Conduct of the Levemir/Novolog Pricing Enterprise**

224.    During the class period, Novo Nordisk exerted control over the Levemir/Novolog Pricing Enterprise and participated in the operation or management of the affairs of the Levemir/Novolog Pricing Enterprise, directly or indirectly, in the following ways:

        a.      Novo Nordisk selected and published the Levemir and Novolog benchmark prices;

010646-11  932598 V1

b.      Novo Nordisk periodically raised the published Levemir and Novolog benchmark prices;[68]

c.      Novo Nordisk granted to the PBMs substantial rebates representing discounts off of the Levemir and Novolog benchmark prices in exchange for the PBMs' promise to give Levemir and Novolog exclusive or at least favorable, formulary placement;

d.      Novo Nordisk concealed from the public the amount and purpose of the rebates;

e.      Novo Nordisk intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and Novolog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

f.      Representing to the general public, through stating of Levemir and Novolog's benchmark prices without stating that the benchmark prices differed substantially from that negotiated by the PBMs, that the Levemir and Novolog benchmark prices reflected or approximated Levemir and Novolog's actual costs.

225.    The scheme had a hierarchical decision-making structure that was headed by Novo Nordisk.  Novo Nordisk controlled the Levemir and Novolog benchmark prices, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Levemir and Novolog would receive exclusive, or at least favorable, formulary placement.

226.    The PBMs also participated in the conduct of the affairs of the Levemir/Novolog Pricing Enterprise, directly or indirectly, in the following ways:

---

[68] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

a.      The PBMs promised to, and did, confer on Levemir and Novolog exclusive or at least favorable formulary placement;

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Levemir and Novolog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

227.    The scheme devised and implemented by Novo Nordisk, as well as other members of the Levemir/Novolog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Levemir and Novolog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Levemir and Novolog written by plan members' physicians.

C.      **Novo Nordisk's Pattern of Racketeering Activity**

228.    Novo Nordisk conducted and participated in the conduct of the affairs of the Levemir/Novolog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Levemir/Novolog Pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Levemir and Novolog pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B).  Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Novo Nordisk and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

229.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and members of the class.  Novo Nordisk and the PBMs calculated and intentionally crafted the Levemir and Novolog pricing scheme to ensure their own profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and members of the class who would be over-billed for Levemir and Novolog.  In designing and implementing the scheme, at all times Novo Nordisk was cognizant of the fact that those in the distribution chain who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs in setting benchmark prices and establishing rebates.

230.    By intentionally and artificially inflating the Levemir and Novolog benchmark prices, and then subsequently failing to disclose such practices to the individual patients, health plans, and insurers, Novo Nordisk and the PBMs engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

231.    Novo Nordisk's and the PBMs' racketeering activities amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Novo Nordisk was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including Plaintiffs and members of the class.  Novo Nordisk has engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of its Levemir/Novolog Pricing Enterprise.

232.     The pattern of racketeering activity alleged herein and the Levemir/Novolog

Pricing Enterprise are separate and distinct from each other.  Likewise, Novo Nordisk is distinct

from the Levemir/Novolog Pricing Enterprise.

233.     The pattern of racketeering activity alleged herein is continuing as of the date of

this complaint, and, upon information and belief, will continue into the future unless enjoined by

this Court.

**D.     Novo Nordisk's Use of the U.S. Mail and Interstate Wire Facilities**

234.     The Levemir/Novolog Pricing Enterprise engaged in and affected interstate

commerce because it engaged in the following activities across state boundaries:  the

transmission and publication of false and misleading information concerning the Levemir and

Novolog benchmark prices; the payment from Novo Nordisk to the PBMs of substantial rebates

off of the benchmark price; and transmission of false or incomplete statements intended to

mislead health care payers and consumers regarding the existence, amount, and purpose of the

rebates.

235.     During the class period, the Levemir/Novolog Pricing Enterprise's unlawful

conduct and wrongful practices were carried out by an array of employees, working across state

boundaries, who necessarily relied upon frequent transfers of documents, information, products,

and funds by the U.S. Mail and interstate wire facilities.

236.     The nature and pervasiveness of the Levemir and Novolog pricing fraud scheme,

which was orchestrated out of the corporate headquarters of Novo Nordisk and each PBM,

necessarily required those headquarters to communicate directly and frequently by U.S. Mail and

interstate wire facilities.

237.     Many of the precise dates of the Levemir/Novolog Pricing Enterprise's uses of the

U.S. Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire

fraud) have been hidden and cannot be alleged without access to Novo Nordisk's, CVS

Caremark's, Express Scripts's, and OptumRx's books and records.  Indeed, an essential part of

the successful operation of the Enterprise alleged herein depended upon secrecy.  However,

Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud

and wire fraud occurred, and how those acts were in furtherance of the scheme; Plaintiffs

describe this below.

238.    Novo Nordisk's use of the U.S. Mail and interstate wire facilities to perpetrate the

Levemir and Novolog pricing fraud scheme involved thousands of communications throughout

the class period including, *inter alia*:

a.    Marketing materials about Novo Nordisk's Levemir and Novolog products

and its price, which Novo Nordisk sent to health care payers and health care providers located

across the country;

b.    Written communications between Novo Nordisk and the publishers of

benchmark price compendia regarding the Levemir and Novolog benchmark prices and their

subsequent mark-ups, which occurred on a regular basis each year;

c.    Written representations and telephone calls between Novo Nordisk and

CVS Caremark regarding Levemir and Novolog markups and benchmark prices;

d.    Written representations and telephone calls between Novo Nordisk and

Express Scripts regarding Levemir and Novolog markups and benchmark prices;

e.    Written representations and telephone calls between Novo Nordisk and

OptumRx regarding Levemir and Novolog markups and benchmark prices;

f.    Written representations and telephone calls between Novo Nordisk and

CVS Caremark regarding Levemir and Novolog rebates;

g. Written representations and telephone calls between Novo Nordisk and Express Scripts regarding Levemir and Novolog rebates;

h. Written representations and telephone calls between Novo Nordisk and OptumRx regarding Levemir and Novolog rebates;

i. Hundreds of e-mails between Novo Nordisk and the PBMs agreeing to or effectuating the implementation of the Levemir and Novolog pricing fraud scheme;

j. Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Levemir and Novolog benchmark prices were; the existence, amount, or purpose of the Levemir and Novolog rebates; and the true costs of Levemir and Novolog that were designed to conceal the scheme, deter investigations into Levemir and Novolog pricing, or forestall changes to healthcare payers reimbursement of Levemir and Novolog prescriptions based on something other than Levemir and Novolog benchmark prices; and

k. receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

239. In addition to the above-referenced RICO predicate acts, it was foreseeable to Novo Nordisk that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and class members.

**E.     Damages Caused by Novo Nordisk's Levemir and Novolog Pricing Fraud**

240. Novo Nordisk's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for Levemir and/or Novolog.

241.     As described above, when a healthcare consumer fills a prescription for a drug like Levemir and/or Novolog, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

242.     The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Novo Nordisk, through the Levemir/Novolog Pricing Enterprise, artificially inflates the Levemir and Novolog benchmark prices, it also artificially inflates the consumers' out-of-pocket expenses.

243.     Plaintiffs' injuries, and those of the class members, were proximately caused by Novo Nordisk's racketeering activity.  But for the misstatements made by Novo Nordisk and the PBMs and the pricing scheme employed by the Levemir/Novolog Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Levemir and Novolog expenses.

244.     Plaintiffs' injuries were directly caused by Novo Nordisk's racketeering activity. Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the

- 86 -

Levemir/Novolog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

245.    And although the Levemir/Novolog Pricing Enterprise was effectuated to give Novo Nordisk a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Novo Nordisk's competitors.

246.    Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other Plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Novo Nordisk's fraudulent scheme.

247.    By virtue of these violations of 18 U.S.C. § 1962(c), Novo Nordisk is liable to Plaintiffs for three times the damages they have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT THREE

### VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1961, *ET SEQ.*

248.    Plaintiffs Chaires, Gilleland, Girard, John Doe, Kinhan, McLaughlin, and Wofford hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

249.    This claim is brought on behalf of the class against Eli Lilly for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962, *et seq.*

250.     Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c).

251.     Plaintiffs and the members of the class are each "persons," as that term is defined in 18 U.S.C. § 1961(3) who were injured in their business or property as a result of Eli Lilly's wrongful conduct.

A.     **The Humalog Pricing Enterprise**

252.     Under 18 U.S.C. § 1961(4) a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose.

253.     Eli Lilly formed just such an association-in-fact enterprise—sometimes referred to in this complaint as the Humalog Pricing Enterprise.  The Humalog Pricing Enterprise consists of (a) Eli Lilly, including its employees and agents; (b) the PBM CVS Caremark, including its employees and agents; (c) the PBM Express Scripts, including its employees and agents; and (d) the PBM OptumRx, including its employees and agents.

254.     The Humalog Pricing Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systematic links for a common purpose:  to secure an exclusive, or at least favorable, formulary position for Eli Lilly's long-acting analog insulin product, Humalog, as a treatment for type 1 and 2 diabetes to the exclusion or detriment of competitor products and consumers.

255.     To accomplish this purpose, the Humalog Pricing Enterprise periodically and systematically inflated the benchmark price of Humalog and represented—either affirmatively or through half-truths and omissions—to the general public, health care payers, and consumers,

including Plaintiffs and the class, that Humalog' benchmark price fairly and accurately reflected the actual cost of this drug.  The Enterprise concealed from the public, health care payers, and consumers, like Plaintiffs and class members, the existence and amount of steep rebates Eli Lilly gave to the PBMs.  These rebates were worth at least 25% of the benchmark price.  The Humalog Pricing Enterprise also concealed from the public the purpose of these rebates:  The difference between the benchmark price and the real price of Humalog negotiated by the PBMs resulted in increased profits for the PBMs.  These large rebates served to ensure that the PBMs would place, and maintain, Humalog in a preferred or favorable position on the PBMs' formularies.  By securing a favorable position on the formulary, the Humalog Pricing Enterprise ensured that a larger number of Humalog prescriptions would be written and filled.  This scheme translated into higher sales (and therefore profits) for Eli Lilly and larger spreads for the PBMs.

256.    The persons engaged in the Humalog Pricing Enterprise are systematically linked through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by Eli Lilly.  There is regular communication between Eli Lilly and each of the PBMs, in which information is shared.  Typically, this communication occurred, and continues to occur, through the use of the wires and the mail in which Eli Lilly and the PBMs share information regarding the Humalog benchmark price and discuss and agree on rebate amounts.  Eli Lilly and the PBMs functioned as a continuing unit for the purposes of implementing the Humalog pricing scheme and, when issues arise during the scheme, each agreed to take actions to hide the scheme and continue its existence.

257.    At all relevant times, CVS Caremark was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  CVS Caremark struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from

the inflated rebates.  CVS Caremark represented to the public that the rebates it negotiated saved

health care payers and their plan members (including Plaintiffs and members of the class) money

on their prescription needs.  But it knew that the rebates did not actually decrease the cost of

Humalog for consumers, because the published benchmark price was falsely inflated.  CVS

Caremark also knew, but did not disclose, that the other PBMs—Express Scripts and

OptumRx—were engaged in the same rebating scheme, to the detriment of consumers.  But for

the Humalog Pricing Enterprise's unlawful fraud, CVS Caremark would have had the incentive

to disclose the deceit by Eli Lilly, thereby forcing competition on real price.  By failing to

disclose this information, CVS Caremark perpetuated the Humalog Pricing Enterprise's scheme,

and reaped substantial profits.

258.    At all relevant times, Express Scripts was aware of Eli Lilly's conduct, was a

knowing and willing participant in that conduct, and reaped profits from that conduct.  Express

Scripts struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the

inflated rebates.  Express Scripts represented to the public that the rebates it negotiated saved

health care payers and their plan members (including Plaintiffs and members of the class) money

on their prescription needs.  But it knew that the rebates did not actually decrease the cost of

Humalog for consumers, because the published benchmark price was falsely inflated.  Express

Scripts also knew, but did not disclose, that the other PBMs—CVS Caremark and OptumRx—

were engaged in the same rebating scheme, to the detriment of consumers.  But for the Humalog

Pricing Enterprise's unlawful fraud, Express Scripts would have been incentivized to disclose the

deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this

information, Express Scripts perpetuated the Humalog Pricing Enterprise's scheme, and reaped

substantial profits.

259.    At all relevant times, OptumRx was aware of Eli Lilly's conduct, was a knowing and willing participant in that conduct, and reaped profits from that conduct.  OptumRx struck rebate deals with Eli Lilly to conceal the true price of Humalog and profit from the inflated rebates.  OptumRx represented to the public that the rebates it negotiated saved health care payers and their plan members (including Plaintiffs and members of the class) money on their prescription needs.  But it knew that the rebates did not actually decrease the cost of Humalog for consumers, because the published benchmark price was falsely inflated.  OptumRx also knew, but did not disclose, that the other PBMs—CVS Caremark and Express Scripts—were engaged in the same rebating scheme, to the detriment of consumers.  But for the Humalog Pricing Enterprise's unlawful fraud, OptumRx would have been incentivized to disclose the deceit by its competitors, thereby obtaining a competitive advantage.  By failing to disclose this information, OptumRx perpetuated the Humalog Pricing Enterprise's scheme, and reaped substantial profits.

260.    Furthermore, as public scrutiny, media coverage, and congressional investigations have focused on the rapidly-inflating prices of lifesaving drugs—including insulin—the PBMs did not challenge Eli Lilly's reported benchmark prices, terminate their role in the Humalog Pricing Enterprise, nor disclose publicly that the Humalog benchmark price did not accurately reflect the price actually paid for the drug.

261.    CVS Caremark, Express Scripts, and OptumRx participated in the conduct of the Humalog Pricing Enterprise, sharing the common purpose of securing exclusive or favorable formulary position for Humalog, through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.  The PBMs

knowingly made material misstatements to health care payers, plan members, and the general public in furtherance of the fraudulent scheme regarding:

a.      The actual price of Humalog;

b.      The extent to which the actual price of Humalog departed from the published, artificially-inflated benchmark price;

c.      The extent to which Eli Lilly and the PBMs had negotiated the rebates discounting the benchmark price of Humalog in good faith and for a proper purpose;

d.      Whether the rebates were intended to benefit health care payers, plan members, and/or the general public;

e.      Whether the rebates saved health care payers, plan members, and the general public money;

f.      Whether Humalog's "preferred" formulary status reflected the drug's safety, efficacy, or cost-effectiveness, as determined by the PBMs' P&T Committees;

g.      Whether Humalog would have been placed in a "preferred" formulary position absent the rebates; and

h.      The extent to which the rebating scheme would force plan members to incur additional expenses for their Humalog prescriptions.

262.    Eli Lilly alone could not have accomplished the purpose of the Humalog Pricing Enterprise, without the assistance of the PBMs.  For Eli Lilly to profit from the scheme, the PBMs needed to convince health care payers and plan sponsors to select their formulary, on which Humalog was given favorable treatment.  And the PBMs did so through misrepresentations:  they told clients, potential clients, and investors that they secured significant discounts.  However, these discounts were only significant because the benchmark prices were

artificially inflated.  The discounts were fictitious:  the result of a deliberate scheme to create large rebates without lowering real prices.  Without these misrepresentations, the Humalog Pricing Enterprise could not have achieved its common purpose.

263.    The Humalog Pricing Enterprise engaged in and affected interstate commerce because, *inter alia*, it set the price of drugs that were sold to and utilized by thousands of class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico.

264.    The impacts of the Humalog Pricing Enterprise's scheme are still in place—*i.e.*, the increased spread between the Humalog benchmark price and the actual price of Humalog is still being maintained, and increased.  Consequently, PBMs and pharmacies make a profit on the spread between benchmark price and the actual acquisition cost—*i.e.*, the rebates.  Under this system, a higher spread results in increased profits to PBMs and pharmacies.

265.    The foregoing evidenced that Eli Lilly, CVS Caremark, Express Scripts, and OptumRx were each willing participants in the Humalog Pricing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose, *i.e.*, through Eli Lilly's artificial inflation of the Humalog benchmark price, coupled with Eli Lilly's and the PBMs' creation of substantial rebates, and the PBMs' misstatements to the drug-purchasing public that those rebates benefitted health care payer and consumers like Plaintiffs and the class.

**B.      Conduct of the Humalog Pricing Enterprise**

266.    During the class period, Eli Lilly exerted control over the Humalog Pricing Enterprise and participated in the operation or management of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

            a.      Eli Lilly selected and published the Humalog benchmark price;

b.      Eli Lilly periodically raised the published Humalog benchmark price;[69]

c.      Eli Lilly granted to the PBMs substantial rebates representing discounts off of the Humalog benchmark price in exchange for the PBMs' promise to give Humalog exclusive or at least favorable, formulary placement;

d.      Eli Lilly concealed from the public the amount and purpose of the rebates;

e.      Eli Lilly intended that the PBMs would (and did) distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Humalog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

f.      Representing to the general public, through stating of Humalog's benchmark price without stating that the benchmark price differed substantially from that negotiated by PBMs, that the Humalog benchmark price reflected or approximated Humalog's actual cost.

267.    The scheme had a hierarchical decision-making structure that was headed by Eli Lilly.  Eli Lilly controlled the Humalog benchmark price, and doled out rebates to the PBMs in exchange for the PBMs' assurances that Humalog would receive exclusive, or at least favorable, formulary placement.

268.    The PBMs also participated in the conduct of the affairs of the Humalog Pricing Enterprise, directly or indirectly, in the following ways:

a.      The PBMs promised to, and did, confer on Humalog exclusive or at least favorable formulary placement;

---

[69] *See, e.g.*, *In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 172 (D. Mass. 2003) (finding sufficient allegations of defendants' participation in the conduct of an association-in-fact enterprise where the defendants "collectively determined the price that [the enterprise] would charge doctors for [a drug]," and "set the published AWP thereby determining the spread").

b.      The PBMs distribute through the U.S. Mail and interstate wire facilities, promotional and other materials which claimed that rebates (such as those applied to Humalog) saved health care payers and consumers like Plaintiffs and class members money on their prescription needs; and

c.      The PBMs concealed the existence or amount of the rebates—including those given to their competitors—to further the fraudulent pricing scheme.

269.    The scheme devised and implemented by Eli Lilly, as well as other members of the Humalog Pricing Enterprise, amounted to a common course of conduct intended to (a) secure favorable formulary positioning for Humalog; (b) entice health care payers to select one of the PBMs' formularies; and thereby (c) secure payment for prescriptions of Humalog written by plan members' physicians.

## C.      Eli Lilly's Pattern of Racketeering Activity

270.    Eli Lilly conducted and participated in the conduct of the affairs of the Humalog Pricing Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343, relating to wire fraud.  The pattern of racketeering activity by the Humalog pricing Enterprise likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Humalog pricing scheme.  Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Eli Lilly and the PBMs intended to defraud Plaintiffs, members of the class, and other intended victims.

271.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including Plaintiffs and members of the class.  Eli Lilly and the

PBMs calculated and intentionally crafted the Humalog pricing scheme to ensure their own

profits remained high, without regard to the effect such pricing behavior had on Plaintiffs and

members of the class who would be over-billed for Humalog.  In designing and implementing

the scheme, at all times Eli Lilly was cognizant of the fact that those in the distribution chain

who are not part of the industry rely on the integrity of the pharmaceutical companies and PBMs

in setting benchmark prices and establishing rebates.

272.    By intentionally and artificially inflating the Humalog benchmark price, and then

subsequently failing to disclose such practices to the individual patients, health plans, and

insurers, Eli Lilly and the PBMs engaged in a fraudulent and unlawful course of conduct

constituting a pattern of racketeering activity.

273.    Eli Lilly's and the PBMs' racketeering activities amounted to a common course of

conduct, with a similar pattern and purpose, intended to deceive Plaintiffs and members of the

class.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by Eli Lilly

was related, had similar intended purposes, involved similar participants and methods of

execution, and had the same results affecting the same victims, including Plaintiffs and members

of the class.  Eli Lilly has engaged in the pattern of racketeering activity for the purpose of

conducting the ongoing business affairs of its Humalog Pricing Enterprise.

274.    The pattern of racketeering activity alleged herein and the Humalog Pricing

Enterprise are separate and distinct from each other.  Likewise, Eli Lilly is distinct from the

Humalog Pricing Enterprise.

275.     The pattern of racketeering activity alleged herein is continuing as of the date of

this complaint, and, upon information and belief, will continue into the future unless enjoined by

this Court.

**D.     Eli Lilly's Use of the U.S. Mail and Interstate Wire Facilities**

276.     The Humalog Pricing Enterprise engaged in and affected interstate commerce

because it engaged in the following activities across state boundaries:  the transmission and

publication of false and misleading information concerning the Humalog benchmark price; the

payment from Eli Lilly to the PBMs of substantial rebates off of the benchmark price; and

transmission of false or incomplete statements intended to mislead health care payers and

consumers regarding the existence, amount, and purpose of the rebates.

277.     During the class period, the Humalog Pricing Enterprise's unlawful conduct and

wrongful practices were carried out by an array of employees, working across state boundaries,

who necessarily relied upon frequent transfers of documents, information, products, and funds by

the U.S. Mail and interstate wire facilities.

278.     The nature and pervasiveness of the Humalog pricing fraud scheme, which was

orchestrated out of the corporate headquarters of Eli Lilly and each PBM, necessarily required

those headquarters to communicate directly and frequently by U.S. Mail and interstate wire

facilities.

279.     Many of the precise dates of the Humalog Pricing Enterprise's uses of the U.S.

Mail and interstate wire facilities (and corresponding RICO predicate acts of mail and wire

fraud) have been hidden and cannot be alleged without access to these Eli Lilly's, CVS

Caremark's, Express Scripts's, and OptumRx's books and records.  Indeed, an essential part of

the successful operation of the Enterprise alleged herein depended upon secrecy.  However,

Plaintiffs can generally describe the occasions on which the RICO predicate acts of mail fraud

and wire fraud occurred, and how those acts were in furtherance of the Scheme; Plaintiffs

describe this below.

280.   Defendants' use of the U.S. Mail and interstate wire facilities to perpetrate the

Humalog pricing fraud scheme involved thousands of communications throughout the class

period including, *inter alia*:

a.   Marketing materials about Eli Lilly's Humalog product and its price,

which Eli Lilly sent to health care payers and health care providers located across the country;

b.   Written communications between Eli Lilly and the publishers of

benchmark price compendia regarding the Humalog benchmark price and its subsequent mark-

ups, which occurred on a regular basis each year;

c.   Written representations and telephone calls between Eli Lilly and CVS

Caremark regarding Humalog markups and benchmark price;

d.   Written representations and telephone calls between Eli Lilly and Express

Scripts regarding Humalog markups and benchmark price;

e.   Written representations and telephone calls between Eli Lilly and

OptumRx regarding Humalog markups and benchmark price;

f.   Written representations and telephone calls between Eli Lilly and CVS

Caremark regarding Humalog rebates;

g.   Written representations and telephone calls between Eli Lilly and Express

Scripts regarding Humalog rebates;

h.   Written representations and telephone calls between Eli Lilly and

OptumRx regarding Humalog rebates;

i.      Hundreds of e-mails between Eli Lilly and the PBMs agreeing to or effectuating the implementation of the Humalog pricing fraud scheme;

j.      Written and oral communications directed to U.S. Government agencies and private insurers that fraudulently misrepresented what the Humalog benchmark price was; the existence, amount, or purpose of the Humalog rebates; and the true cost of Humalog that were designed to conceal the scheme, deter investigations into Humalog pricing, or forestall changes to healthcare payers reimbursement of Humalog prescriptions based on something other than Humalog benchmark price; and

k.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme; and

281.    In addition to the above-referenced RICO predicate acts, it was foreseeable to Eli Lilly that the PBMs would distribute publications through the U.S. Mail and by interstate wire facilities, and in those publications, claim that the increased rebates would benefit third-party payors and consumers like Plaintiffs and class members.

**E.      Damages Caused by Eli Lilly's Humalog Pricing Fraud**

282.    Eli Lilly's violations of federal law and its pattern of racketeering activity have directly and proximately caused Plaintiffs and the class members to be injured in their business or property because Plaintiffs and class members have paid inflated out-of-pocket expenses for Humalog.

283.    As described above, when a healthcare consumer fills a prescription for a drug like Humalog, she is responsible for paying all or a portion of the medication's cost.  If the consumer is uninsured, she is responsible for 100% of the drug's costs.  If the consumer has a high-deductible health plan, she must pay for 100% of her drugs until she satisfies her deductible.  If the consumer's health plan contains a coinsurance requirement, she is responsible

for paying a percentage of her drug's cost.  And if the consumer is a member of a Medicare Part D plan, her plan's contributions to the cost of her drugs cuts out after a certain threshold is reached, saddling the consumer with a high percentage of her drug costs until she reaches her maximum contribution.

284.    The amount of each of these cash payments is based on the drug's benchmark price.  Therefore, when Eli Lilly, through the Humalog Pricing Enterprise, artificially inflates the Humalog benchmark price, it also artificially inflates the consumers' out-of-pocket expenses.

285.    Plaintiffs' injuries, and those of the class members, were proximately caused by Eli Lilly's racketeering activity.  But for the misstatements made by Eli Lilly and the PBMs, and the pricing scheme employed by the Humalog Pricing Enterprise, Plaintiffs and others similarly situated would have paid less for their out-of-pocket Humalog expenses.

286.    Plaintiffs' injuries were directly caused by Eli Lilly's racketeering activity.  Drug wholesalers, health care payers, and others in the pharmaceutical supply chain are not responsible for cash payments (by those who have no insurance), coinsurance or deductible payments (by private and public plan members), and payments made in the "Donut Hole" (for Medicare members).  So, although the misstatements made by the PBMs in furtherance of the Humalog Pricing Enterprise were directed primarily to health care payers, those payers did not have to make cash payments for the portions of prescription drugs costs that were, by definition, excluded from their responsibility.  Therefore, the health care payers did not suffer the overcharges that are the harms alleged in this suit.

287.    And although the Humalog Pricing Enterprise was effectuated to give Eli Lilly a wrongfully-obtained advantage over its competitors, the harm this suit seeks to remedy was not suffered by Eli Lilly's competitors.

288.     Plaintiffs and those similarly situated were most directly harmed by the fraud, and there is no other plaintiff or class of plaintiffs better situated to seek a remedy for the economic harms to consumers from Eli Lilly's fraudulent scheme.

289.     By virtue of these violations of 18 U.S.C. § 1962(c), Eli Lilly is liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT FOUR

## VIOLATION OF THE NEW JERSEY
## CONSUMER FRAUD ACT AGAINST SANOFI

## (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

290.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

291.     This claim is brought by Plaintiffs who paid for Lantus, on behalf of all members of the Class.  While Plaintiffs and class members hail from across the country, Sanofi U.S. is a corporation with its headquarters in Bridgewater, New Jersey.  New Jersey "has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries,"[70] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[71]  Furthermore, New Jersey has some of the strongest consumer protection laws in the country so, although other states may have some interest in protecting its own consumers, that interest is not frustrated by the application of New Jersey's law.  "If a strong state policy or

---

[70] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J.1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249, 801 A.2d 281 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[71] *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[72]

292.     The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."  N.J. Stat. Ann. § 56:8-2.

293.     Sanofi and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

294.     Sanofi engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

295.     As described above, through the Lantus Pricing Enterprise, Sanofi engaged in deceptive business practices prohibited by state consumer protection laws, including: inflating the stated benchmark price of Lantus; representing, affirmatively and through omission, that the Lantus benchmark price was the price of Lantus; concealing or misrepresenting the true price of Lantus and the existence and amount of the benchmark-to-real price spread amounting to a discount off the price of Lantus; and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce.  Sanofi engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

---

[72] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the New Jersey CFA).

concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission, in connection with the pricing and sale of Lantus.

296.    From the outset, Sanofi knew, but did not disclose, that the benchmark price it selected and published for Lantus did not reflect the true price of the product—it knew of the substantial spread resulting in a windfall to the PBMs in exchange for the PBMs' agreement to grant Lantus exclusive or at least favorable placement on the formulary.  Sanofi knew, but did not disclose, that the benchmark-to-real price spread did not result in a reduction in the prices paid by consumers who paid for all or part of their Lantus prescriptions out of pocket.  Sanofi knowingly and deliberately misled consumers regarding the purpose, existence, and amount of price reductions off the Lantus benchmark price.

297.    By failing to disclose and by actively concealing this pricing deceit, Sanofi engaged in unfair and deceptive business practices in violation of the New Jersey CFA.  In the course of Sanofi's business, it willfully failed to disclose and actively concealed its misrepresentations regarding Lantus' price.

298.    Sanofi intentionally and knowingly misrepresented material facts regarding the true price of Lantus with the intent to mislead consumers, including Plaintiffs.  As alleged above, Sanofi, through the Lantus Pricing Enterprise, made material misstatements about the price of Lantus and the existence and extent of the Lantus benchmark-to-real price spread that were either false or misleading.

299.    Sanofi owed Plaintiffs a duty to disclose the true price of Lantus and the existence of rebates off of Lantus' benchmark price because Sanofi:

        a.      Possessed exclusive knowledge about the means by which they selected the benchmark price for Lantus;

b.      Knew material non-public information regarding the existence and amount of price reductions off of Lantus' benchmark price; and

c.      Made incomplete representations about the price of Lantus, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

300.    Because Sanofi fraudulently concealed the true price of Lantus, Plaintiffs were deprived of the benefit of their bargain since they paid more than their pro-rata share of the actual price of Lantus (*i.e.*, the price paid by PBMs after the artificially-inflated Lantus benchmark price was reduced by the rebates).

301.    The truth about the actual price of these drugs, as distinguished from the inflated benchmark price, would be material to a reasonable consumer.  So Sanofi's concealment of the Lantus pricing fraud was material to Plaintiffs.  Had Plaintiffs been aware of the true price of Lantus, they would have demanded lower prices of Sanofi.

302.    Sanofi's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true price of Lantus.

303.    Sanofi knew, or should have known, that its conduct violated state consumer protection laws.

304.    As a direct and proximate result of Sanofi's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damages.  As a direct result of Sanofi's misconduct, all Plaintiffs incurred damages in at least the amount of money they paid out-of-pocket for Lantus.

305.    This wrongful conduct by Sanofi, coupled with the damage insured by Plaintiffs and class members, entitles members of the class to relief under the New Jersey CFA.  Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful

conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## COUNT FIVE

### VIOLATION OF THE NEW JERSEY
### CONSUMER FRAUD ACT AGAINST NOVO NORDISK

### (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

306.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

307.    This claim is brought by Plaintiffs who paid for Levemir and Novolog, on behalf of all members of the Class.  While Plaintiffs and class members hail from across the country, Novo Nordisk Inc. is a corporation with its headquarters in Plainsboro, New Jersey.  New Jersey "has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries,"[73] and a "strong interest 'in regulating its domestic businesses and in deterring fraudulent business practices.'"[74]  Furthermore, New Jersey has some of the strongest consumer protection laws in the country so, although other states may have some interest in protecting its own consumers, that interest is not frustrated by the application of New Jersey's law.  "If a strong state policy or interest will [not be] frustrated by the failure to apply [that state's law], it is highly unlikely that that state has any interest whatsoever in blanketing that particular issue with its law."[75]

---

[73] *Boyes v. Greenwich Boat Works*, 27 F. Supp. 2d 543, 547 (D.N.J.1998); *see generally Weinberg v. Sprint Corp.*, 173 N.J. 233, 249, 801 A.2d 281 (2002) (stating that one legislative purpose behind creating a private right of action under the NJCFA was to "punish the wrongdoer through the award of treble damages").

[74] *Kalow & Springut LLP v. Commence Corp.*, 2012 WL 6093876, at *4 (D.N.J. Dec. 7, 2012) (quoting *DalPonte v. Am. Mortg. Express Corp.*, 2006 WL 2403982 (D.N.J. Aug. 16, 2006)).

[75] *Fu v. Fu*, 160 N.J. 108, 122-23 (1999); *Kalow*, 2012 WL 6093876, at *4 (applying *Fu* to the New Jersey CFA).

308.    The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby . . . ."  N.J. Stat. Ann. § 56:8-2.

309.    Novo Nordisk and Plaintiffs are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

310.    Novo Nordisk engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

311.    As described above, through the Levemir/Novolog Pricing Enterprise, Novo Nordisk engaged in deceptive business practices prohibited by state consumer protection laws, including: inflating the stated benchmark prices of Levemir and Novolog; representing, affirmatively and through omission, that the Levemir and Novolog benchmark prices were the prices of Levemir and Novolog; concealing or misrepresenting the true prices of Levemir and Novolog and the existence and amount of the benchmark-to-real price spread amounting to discounts off the prices of Levemir and Novolog; and engaging in other unconscionable, false, misleading or deceptive acts or practices in the conduct of trade or commerce.  Novo Nordisk engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission, in connection with the pricing and sales of Levemir and Novolog.

312.     From the outset, Novo Nordisk knew, but did not disclose, that the benchmark prices it selected and published for Levemir and Novolog did not reflect the true prices of the products—it knew of the substantial spread resulting in a windfall to the PBMs in exchange for the PBMs' agreement to grant Levemir and Novolog exclusive or at least favorable placements on the formulary.  Novo Nordisk knew, but did not disclose, that the benchmark-to-real price spread did not result in a reduction in the prices paid by consumers who paid for all or part of Levemir and/or Novolog prescriptions out of pocket.  Novo Nordisk knowingly and deliberately misled consumers regarding the purpose, existence, and amount of price reductions off Levemir and Novolog's benchmark prices.

313.     By failing to disclose and by actively concealing this pricing deceit, Novo Nordisk engaged in unfair and deceptive business practices in violation of the New Jersey CFA. In the course of Novo Nordisk's business, it willfully failed to disclose and actively concealed its misrepresentations regarding Levemir and Novolog's prices.

314.     Novo Nordisk intentionally and knowingly misrepresented material facts regarding the true prices of Levemir and Novolog with the intent to mislead consumers, including Plaintiffs.  As alleged above, Novo Nordisk, through the Levemir/Novolog Pricing Enterprise, made material misstatements about the prices of Levemir and Novolog and the existence and extent of the Levemir and Novolog benchmark-to-real price spreads that were either false or misleading.

315.     Novo Nordisk owed Plaintiffs a duty to disclose the true prices of Levemir and Novolog and the existence of rebates off of Levemir and Novolog's benchmark prices because Novo Nordisk:

010646-11  932598 V1

a.      Possessed exclusive knowledge about the means by which it selected the benchmark prices for Levemir and Novolog;

b.      Knew material non-public information regarding the existence and amount of price reductions off of Levemir and Novolog's benchmark price; and

c.      Made incomplete representations about the prices of Levemir and Novolog, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

316.    Because Novo Nordisk fraudulently concealed the true price of Levemir and Novolog, Plaintiffs were deprived of the benefit of their bargain since they paid more than their pro-rata share of the actual prices of Levemir and Novolog (*i.e.*, the price paid by PBMs after the artificially-inflated Levemir and Novolog benchmark prices were reduced by the rebates).

317.    The truth about actual prices of these drugs, as distinguished from the inflated benchmark prices, would be material to a reasonable consumer.  So Novo Nordisk's concealment of the Levemir and Novolog pricing fraud was material to Plaintiffs.  Had Plaintiffs been aware of the true prices of Levemir and Novolog, they would have demanded lower prices.

318.    Novo Nordisk's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true prices of Levemir and Novolog.

319.    Novo Nordisk knew, or should have known, that its conduct violated state consumer protection laws.

320.    As a direct and proximate result of Novo Nordisk's violations of the New Jersey CFA, Plaintiffs have suffered injury-in-fact and/or actual damages.  As a direct result of Novo

Nordisk's misconduct, all Plaintiffs incurred damages in at least the amount of money they paid out-of-pocket for Levemir and Novolog.

321.    This wrongful conduct by Novo Nordisk, coupled with the damage insured by Plaintiffs and class members, entitles members of the class to relief under the New Jersey CFA. Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.


## COUNT SIX

## VIOLATION OF THE ALABAMA DECEPTIVE TRADE PRACTICES ACT

## (ALA. CODE § 8-19-1, *ET SEQ.*)

322.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs[76] hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

323.    This claim is brought by Plaintiffs on behalf of residents of Alabama who are members of the Class.

324.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(11) Making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions"; and "(27) engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."  Ala. Code § 8-19-5.

325.    Plaintiffs and class members are "consumers" within the meaning of Ala. Code. § 8-19-3(2).

---

[76] The Sanofi Plaintiffs are Chaires, Jane Doe, Gilleland, Girard, Hasselbach, McLaughlin, and Wofford.  The Novo Nordisk Plaintiffs are Denault, Hasselbach, and Teachman.  The Eli Lilly Plaintiffs are Chaires, Gilleland, Girard, John Doe, Kinhan, McLaughlin, and Wofford.

326.     Plaintiffs, class members, Sanofi, Novo Nordisk, and Eli Lilly are "persons" within the meaning of Ala. Code § 8-19-3(3).

327.     Each Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

328.     Pursuant to Alabama Code § 8-19-10, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

329.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ala. Code. § 8-19-1 *et seq.*

330.     On January 24, 2017, and January 25, 2017, certain Plaintiffs sent letters complying with Ala. Code § 8-19-10(e).  Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

## COUNT SEVEN

## VIOLATION OF THE ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

## (ALASKA STAT. ANN. § 45.50.471, *ET SEQ.*)

331.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

332.     This claim is brought by Plaintiffs on behalf of residents of Alaska who are members of the Class.

333.     The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska CPA") declared unfair methods of competition and unfair or deceptive acts or practices in the conduct of

trade or commerce unlawful, including "(10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived or damaged." Alaska Stat. Ann. § 45.50.471.

334.    Pursuant to Alaska Stat Ann. § 45.50.531, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) three times the actual damages in an amount to be determined at trial or (b) $500 for each plaintiff.

335.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices pursuant to Alaska Stat. Ann. § 45.50.535(b)(1), attorneys' fees, and any other just and proper relief available under the Alaska CPA.

336.    On January 24, 2017, and January 25, 2017, Plaintiffs sent letters complying with Alaska Stat. Ann. § 45.50.535(b)(1).

## COUNT EIGHT

## VIOLATION OF THE ARIZONA CONSUMER FRAUD ACT

## (ARIZONA REV. STAT. § 44-1521, *ET SEQ.*)

337.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

338.    This claim is brought by Plaintiffs on behalf of residents of Arizona who are members of the Class.

339.    The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud . . . ,

misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A).

340.    Defendants, Plaintiffs, and class members are "persons" within the meaning of the Arizona CFA, Ariz. Rev. Stat. § 44-1521(6).

341.    Each drug at issue is "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

342.    Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

343.    Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against each Defendant in an amount to be determined at trial.  Plaintiffs also seek punitive damages because each Defendant engaged in aggravated and outrageous conduct with an evil mind.

344.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

## COUNT NINE

## VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT

## (ARK. CODE ANN. § 4-88-101 *ET SEQ.*)

345.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

346.    This claim is brought by Plaintiffs on behalf of residents of Arkansas who are members of the Class.

- 112 -

347.    The Arkansas Deceptive Trade Practices Act ("Arkansas DTPA") prohibits "[d]eceptive and unconscionable trade practices," which include, but are not limited to, "[e]ngaging in any . . . unconscionable false, or deceptive act or practice in business, commerce, or trade."  Ark. Code. Ann. § 4-88-107(a)(10).  The Arkansas DTPA also prohibits, in connection with the sale or advertisement of any goods, "1) the act, use, or employment by any person of any deception, fraud, or pretense; or (2) the concealment, suppression, or omission of any material fact with intent that other rely upon the concealment, suppression, or omission." Ark Code. Ann. § 4-88-108.

348.    Defendants, Plaintiffs, and class members are "persons" within the meaning of Ark. Code. Ann. § 4-88-102(5).

349.    Each drug at issue constitutes "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

350.    Plaintiffs seek monetary relief against Defendants in an amount to be determined at trial.  Plaintiffs also seek punitive damages because Defendants acted wantonly in causing Plaintiffs' and class members' injuries, or with such a conscious indifference to the consequences that malice may be inferred.

351.    Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas DTPA.

## COUNT TEN

## VIOLATION OF THE CALIFORNIA LEGAL REMEDIES ACT

## (CAL. CIV. CODE § 1750, *ET SEQ*.)

352.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

353.     This claim is brought by Plaintiffs on behalf of residents of California who are members of the Class.

354.     The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]"  Cal. Civ. Code § 1770(a).

355.     Each Defendant is a "person" under Cal. Civ. Code § 1761(c).

356.     Plaintiffs and class members are "consumers" as defined by Cal. Civ. Code § 1761(d), who purchased one or more prescriptions of each drug at issue.

357.     Plaintiffs seek injunctive relief under the CLRA.  On January 24, 2017, and January 25, 2017, Plaintiffs sent demand letters pursuant to the Cal. Civ. Code § 1782(d).

358.     Plaintiffs will seek, under Cal. Civ. Code § 1780(a), monetary relief against each Defendant for the harm caused by Defendants' violations of the CLRA as alleged herein, but will do so thirty days after this complaint.

359.     Under Cal. Civ. Code § 1780(b), Plaintiffs seek an additional award against each Defendant of up to $5,000 for each plaintiff or class member who qualifies as a "senior citizen" or "disabled person" under the CLRA.  Each Defendant knew or should have known that its conduct was directed to one or more Plaintiffs or class members who are senior citizens or disabled persons.  Defendants' conduct caused one or more of these senior citizens or disabled persons to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the senior citizen or disabled person.  One or more Plaintiffs or class members who are senior citizens or disabled persons are substantially more vulnerable to each Defendant's conduct because of age, poor health or

infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered

substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

360.    Plaintiffs will amend to seek these damages thirty days after this action has been

filed.

361.    Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or

practices, restitution, costs of court, and attorneys' fees pursuant to Cal. Civ. Code § 1780(e),

and any other just and proper relief available under the CLRA.

362.    Plaintiffs have sent letters complying with Cal. Civ. Code § 1780(b) on January

24, 2017, and January 25, 2017.

## COUNT ELEVEN

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

## (CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*)

363.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by

reference the allegations contained in the preceding paragraphs of this complaint.

364.    This claim is brought by Plaintiffs on behalf of residents of California who are

members of the Class.

365.    California Business and Professions Code § 17200 (the "Unfair Competition

Law," or "UCL") prohibits "unlawful, unfair, or fraudulent business acts or practices."

Defendants violated the "unlawful" prong of § 17200 by their violations of the CLRA, Cal. Civ.

Code § 1750, *et seq.*, as described above.  Defendants also violated the "fraudulent" prong of

§ 17200 through their pricing fraud, as described throughout this complaint.  And Defendants

violated the "unfair" prong of § 17200 because the acts and practices set forth in this complaint,

including artificially inflating benchmark prices to offer large rebates to the PBMs caused

Defendants and the PBMs to profit at the expense of consumers, and the harm caused to consumers greatly outweighs any benefits associated with those practices.

366.    Defendants' actions, as set forth above, occurred within the conduct of their business, and in trade or commerce.

367.    Plaintiffs request that this Court enter such orders or judgments as may be necessary, including a declaratory judgment that each Defendant has violated the UCL; an order enjoining Defendants from continuing its unfair, unlawful and/or fraudulent trade practices; an order restoring to Plaintiffs any money lost as result of each Defendant's unfair, unlawful, and/or fraudulent trade practices, including restitution and disgorgement of any profits Defendants received as a result of its unfair, unlawful, or fraudulent practices, as provided in Cal. Bus. & Prof. Code § 17203, Cal. Civ. Proc. Code § 384, and Cal. Civ. Code § 3345; and for any other relief as may be just and proper.

## COUNT TWELVE

## VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT

## (COLO. REV. STAT. § 6-1-101, *ET SEQ.*)

368.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

369.    This claim is brought by Plaintiffs on behalf of residents of Colorado who are members of the Class.

370.    The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business including, but not limited to, "mak[ing] false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;" and "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an

advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction."  Colo. Rev. Stat. § 6-1-105.

371.    Each Defendant is a "person" under Colo. Rev. Stat. § 6-1-102(6).

372.    Plaintiffs and class members are "consumers" for purposes of Col. Rev. Stat § 6-1-113(1)(a).

373.    Each Defendant's conduct, as set forth above, occurred in the conduct or trade or commerce.

374.    Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or class member.

375.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper remedy under the Colorado CPA.

## COUNT THIRTEEN

## VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
## (CONN. GEN. STAT. § 42-110A, *ET SEQ.*)

376.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

377.    This claim is brought by Plaintiffs on behalf of residents of Connecticut who are members of the Class.

378.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).

010646-11  932598 V1

379.     Each Defendant is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

380.     Defendants' challenged conduct occurred in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

381.     Plaintiffs and class members are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

382.     Defendants acted with reckless indifference to another's rights, or wanton or intentional violation of another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard for the rights and safety of others.  Therefore, punitive damages are warranted.

## COUNT FOURTEEN

## VIOLATION OF THE DELAWARE CONSUMER FRAUD ACT

## (DEL. CODE TIT. 6, § 2513, *ET SEQ.*)

383.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

384.     This claim is brought by Plaintiffs on behalf of residents of Delaware who are members of the Class.

385.     The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby."  Del. Code tit. 6, § 2513(a).

386.     Each Defendant is a "person" within the meaning of Del. Code tit. 6, § 2511(7).

387.     Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

388.     Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct.  *See, e.g., Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980).  Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Delaware CFA.

389.     Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

## COUNT FIFTEEN

## VIOLATION OF THE D.C. CONSUMER PROTECTION PROCEDURES ACT

## (D.C. CODE § 28-3901, *ET SEQ.*)

390.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

391.     This claim is brought by Plaintiffs on behalf of residents of the District of Columbia who are members of the Class.

392.     The Consumer Protection Procedures Act ("District of Columbia CPPA") states: "it shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to," *inter alia*, "(f) fail to state a material fact if such failure tends to mislead;" "(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead;" "(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;" or "(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices."  D.C. Code § 28-3904.

393.     Each Defendant is a "person" under D.C. Code § 28-3901(a)(1).

394.     Plaintiffs and class members are "consumers," as defined by D.C. Code § 28-3901(1)(2), who purchased the drugs at issue.

395.     Defendants' actions as set forth in this complaint constitute "trade practices" under D.C. Code § 28-3901.

396.     Plaintiffs and class members are entitled to recover treble damages or $1500, whichever is greater, punitive damages, reasonable attorneys' fees, and any other relief the court deems proper, under D.C. Code § 28-3901.

397.     Plaintiffs seek punitive damages against Defendants because Defendants' conduct evidences malice and/or egregious conduct.  Defendants misrepresented the actual price of these drugs, inflated the benchmark price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its life-saving product without regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to sustain their life.  Defendants' conduct constitutes malice warranting punitive damages.

## COUNT SIXTEEN

## VIOLATION OF THE FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (FLA. STAT. § 501.201, *ET SEQ.*)

398.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

399.     This claim is brought by Plaintiffs on behalf of residents of Florida who are members of the Class.

010646-11  932598 V1

400.    The Florida Unfair and Deceptive Trade Practices Act ("FUDTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

401.    Plaintiffs and class members are "consumers" within the meaning of Fla. Stat. § 501.203(7).

402.    Each Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

403.    Plaintiffs are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

404.    Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FUDTPA.

## COUNT SEVENTEEN

## VIOLATION OF THE GEORGIA FAIR BUSINESS PRACTICES ACT

## (GA. CODE ANN. § 10-1-390, *ET SEQ.*)

405.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint

406.    On January 24 and 25, 2017, certain Plaintiffs sent letters complying with Ga. Code Ann. § 10-1-399(b).  Plaintiffs will amend to add claims within thirty days after these letters were sent.

## COUNT EIGHTEEN

## VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT

## (GA. CODE. ANN § 10-1-370, *ET SEQ.*)

407.    Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices," which include "[m]ak[ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code. Ann § 10-1-372(a).

408.    Defendants, Plaintiffs, and class members are "persons" within the meaning of Ga. Code Ann. § 10-1-371(5).

409.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under Ga. Code Ann. § 10-1-373.

## COUNT NINETEEN

## VIOLATION OF THE HAWAII ACT § 480-2(A)

## (HAW. REV. STAT. § 480, *ET SEQ.*)

410.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

411.    This claim is brought by Plaintiffs on behalf of residents of Hawaii who are members of the Class.

412.    Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

413.    Each Defendant is a "person" under Haw. Rev. Stat. § 480-1.

414.    Plaintiffs and class members are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased the drug at issue.

415.    Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) $1000 and (b) threefold actual damages in an amount to be determined at trial.

416.    Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against each Defendant of up to $10,000 for each violation directed at a Hawaii elder.  Each Defendant knew or should have known that its conduct was directed to one or more Plaintiffs who are elders.  Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  Plaintiffs who are elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered a substantial physical, emotional, or economic damage resulting from each Defendant's conduct.

## COUNT TWENTY

## VIOLATION OF THE IDAHO CONSUMER PROTECTION ACT

## (IDAHO CODE ANN. § 48-601, *ET SEQ.*)

417.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

418.    This claim is brought by Plaintiffs on behalf of residents of Idaho who are members of the Class.

419.    The Idaho Consumer Protection Act ("Idaho CPA") prohibits deceptive business practices, including, but not limited to, "(11) [m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(17) [e]ngaging in any

act or practice which is otherwise misleading, false, or deceptive to the consumer;" or "(18) engaging in any unconscionable method, act or practice in the conduct of trade or commerce," Idaho Code Ann.. § 48-603.

420.   Each Defendant is a "person" under Idaho Code Ann. § 48-602(1).

421.   Defendants' acts or practices as set forth above occurred in the conduct of "trade" or "commerce" under Idaho Code Ann. § 48-602(2).

422.   Pursuant to Idaho Code § 48-608, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $1000 for each plaintiff.

423.   Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Idaho CPA.

424.   Plaintiffs also seek punitive damages against Defendants because each Defendant's conduct evidences an extreme deviation from reasonable standards.  Defendants flagrantly, maliciously, and fraudulently misrepresented the actual cost of Lantus and the existence, purpose, and amount of the rebates granted to the PBMs; and concealed facts that only it knew.  Defendants' unlawful conduct constitutes malice, oppression and fraud warranting punitive damages.

## COUNT TWENTY-ONE

### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

### (815 ILL. COMP. STAT. § 505/1, *ET SEQ*. AND 720 ILL. COMP. STAT. § 295/1A)

425.   The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

426.    This claim is brought by Plaintiffs on behalf of residents of Illinois who are members of the Class.

427.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use of employment of any deception, fraud, false pretense, tales promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived, or damaged thereby." 815 Ill. Comp. Stat. § 505/2.

428.    Each Defendant is a "person" as that term is defined in 815 Ill. Comp. Stat. § 505/1(c).

429.    Plaintiffs and class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

430.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs seek monetary relief against each Defendant in the amount of actual damages, as well as punitive damages because Defendants each acted with fraud and/or malice and/or was grossly negligent.

431.    Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1 *et seq.*

**COUNT TWENTY-TWO**

**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**

**(IND. CODE § 24-5-0.5-3)**

432.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

010646-11 932598 V1

433.    This claim is brought by Plaintiffs on behalf of residents of Indiana who are members of the Class.

434.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive business practice[s]" or acts, including but not limited to representations that "a specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." Ind. Code § 24-5-0.5-3(b).

435.    Each Defendant is a "person" within the meaning of Ind. Code § 25-5-0.5-2(a)(2), and a "supplier" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

436.    Plaintiffs' payments for insulin are "consumer transactions" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

437.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each plaintiff, including treble damages up to $1000 for Defendants' willfully deceptive acts.

438.    Plaintiffs also seek punitive damages based on the outrageousness and recklessness of each Defendant's conduct.

439.    On January 24, 2017, and January 25, 2017, certain Plaintiffs sent letters complying with Ind. Code § 24-5-0.5-5(a).  Because each Defendant failed to remedy its unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which they are entitled.

## COUNT TWENTY-THREE

## VIOLATION OF THE IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT

## (IOWA CODE § 714H.1, *ET SEQ.*)

440.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

441.    This claim is brought by Plaintiffs on behalf of residents of Iowa who are members of the Class.

442.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in connection with the advertisement, sale, or lease of consumer merchandise."  Iowa Code § 714H.3.

443.    Each Defendant is a "person" under Iowa Code § 714H.2(7).

444.    Plaintiffs and class members are "consumers" as defined by Iowa Code § 714H.2(3), who purchased insulin.

445.    Pursuant to Iowa Code § 714H.5, Plaintiffs seek an order enjoining each Defendant's unfair and/or deceptive acts or practices; actual damages; and statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and wanton disregard for the rights and safety of others; attorneys' fees; and other such equitable relief as the court deems necessary to protect the public from further violations of the Iowa CFA.

## COUNT TWENTY-FOUR

## VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT

## (KAN. STAT. ANN. § 50-623, *ET SEQ.*)

446.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

447.     This claim is brought by Plaintiffs on behalf of residents of Kansas who are members of the Class.

448.     The Kansas Consumer Protection Act ("Kansas CPA") states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-626(a).  Deceptive acts or practices include, but are not limited to, "the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" "the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact;" "making false or misleading representations, knowingly or with reason to know, of fact concerning the reason for, existence of or amounts of price reductions," "whether or not any consumer has in fact been misled."  Kan. Stat. Ann. § 50-626.

449.     Plaintiffs and class members are "consumers" within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased insulin.

450.     The sale of insulin to Plaintiffs was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

451.     Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each plaintiff.

452.     Plaintiffs also seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann. § 50-623, *et seq.*

## COUNT TWENTY-FIVE

## VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT

## (KY. REV. STAT. ANN. § 367.110, *ET SEQ.*)

453.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

454.     This claim is brought by Plaintiffs on behalf of residents of Kentucky who are members of the Class.

455.     The Kentucky Consumer Protection Act ("Kentucky CPA") makes unlawful "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." Ky. Rev. Stat. Ann. § 367.170(1).

456.     Defendants, Plaintiffs, and class members are "persons" within the meaning of Ky. Rev. Stat. Ann. § 367.110(1).

457.     Each Defendant engaged in "trade" or "commerce" within the meaning of Ky. Rev. Stat. Ann. § 367.110(2).

458.     Pursuant to Ky. Rev. Stat. Ann. § 367.220, Plaintiffs seek to recover actual damages in an amount to be determined at trial; an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees and any other just and proper relief available under Ky. Rev. Stat. Ann. § 367.220.

- 129 -

## COUNT TWENTY-SIX

## VIOLATION OF THE LOUISIANA UNFAIR TRADE PRACTICES
## AND CONSUMER PROTECTION LAW

### (LA. REV. STAT. ANN. § 51:1401, *ET SEQ.*)

459.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

460.    This claim is brought by Plaintiffs on behalf of residents of Louisiana who are members of the Class.

461.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. Ann. § 51:1405(A).

462.    Defendants, Plaintiffs, and class members are "persons" within the meaning of La. Rev. Stat. Ann. § 51:1402(8).

463.    Plaintiffs and class members are "consumers" within the meaning of La. Rev. Stat. Ann. § 51:1402(1).

464.    Each Defendant engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. Ann. § 51:1402(9).

465.    Pursuant to La. Rev. Stat. Ann. § 51:1409, Plaintiffs seek to recover actual damages in an amount to be determined at trial; treble damages for  knowing violations of the Louisiana CPL; an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. Ann. § 51:1409.

## COUNT TWENTY-SEVEN

## VIOLATION OF THE MAINE UNFAIR TRADE PRACTICES ACT

## (ME. REV. STAT. ANN. TIT. 5, § 205-A, *ET SEQ*.)

466.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

467.    This claim is brought by Plaintiffs on behalf of residents of Maine who are members of the Class.

468.    The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  Me. Rev. Stat. Ann. tit. 5, § 207.

469.    Defendants, Plaintiffs, and class members are "persons" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(2).

470.    Defendants are engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. tit. § 5, 206(3).

471.    Pursuant to Me. Rev. Stat. Ann. tit. 5, § 213, Plaintiffs seek an order enjoining each Defendant's unfair and/or deceptive acts or practices.

472.    On January 24, 2017, and January 25, 2017, Plaintiffs sent letters complying with Me. Rev. Stat. Ann. tit. 5, § 213(1-A).  If Defendants fail to remedy their unlawful conduct within the requisite time period, Plaintiffs will seek all damages and relief to which they are entitled.

010646-11  932598 V1

## COUNT TWENTY-EIGHT

## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT

## (MD. CODE, COM. LAW § 13-101, *ET SEQ.*)

473.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

474.     This claim is brought by Plaintiffs on behalf of residents of Maryland who are members of the Class.

475.     The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive;" "false or misleading representation[s] of fact which concern[] . . . [t]he reason of or the existence or amount of a price reduction;" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," Md. Code, Com. Law § 13-301, regardless of whether the consumer is actually deceived or damaged, Md. Code, Com. Law § 13-302.

476.     Defendants, Plaintiffs, and class members are "persons" within the meaning of Md. Code, Com. Law § 13-101(h).

477.     Pursuant to Md. Code, Com. Law § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

## COUNT TWENTY-NINE

## VIOLATION OF THE MASSACHUSETTS GENERAL LAW CHAPTER 93(A)

## (MASS. GEN. LAWS CH. 93A, § 1, *ET SEQ.*)

478.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

479.     This Count is a placeholder only and will be formally asserted 30 days after demand letters were sent.  Letters were sent on January 24, 2017, and January 25, 2017.

480.     This claim is brought by Plaintiffs on behalf of residents of Massachusetts who are members of the Class.

481.     Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws ch. 93A, § 2.

482.     Defendants, Plaintiffs, and class members are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

483.     Each Defendant engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws ch. 93A, § 1(b).

484.     Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs will seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each plaintiff.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, up to three times actual damages, but no less than two times actual damages.

485.     Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

486.     On January 24, 2017, and January 25, 2017, certain Plaintiffs sent letters complying with Mass. Gen. Laws ch. 93A, § 9(3).

**COUNT THIRTY**

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**

**(MICH. COMP. LAWS § 445.903, *ET SEQ.*)**

487.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

488.     This claim is brought by Plaintiffs on behalf of residents of Michigan who are members of the Class.

489.     The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "charging the consumer a price that is grossly in excess of the price at which similar property or services are sold;" "[m]aking a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" or "[f]ailing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).

490.     Plaintiffs and class members are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

491.     Each Defendant is a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

492.     Plaintiffs seek injunctive relief to enjoin Defendants from continuing its unfair and deceptive acts; monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250

for each plaintiff; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

493.    Plaintiffs also seek punitive damages because each Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants maliciously and egregiously misrepresented actual price of these drugs, inflated the benchmark price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its life-saving product without regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to sustain their life.  Defendants' conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT THIRTY-ONE

## VIOLATION OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
## (MINN. STAT. § 325F.68, *ET SEQ.*)

494.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

495.    This claim is brought by Plaintiffs on behalf of residents of Minnesota who are members of the Class.

496.    The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."  Minn. Stat. § 325F.69(1).

497.    Each purchase of insulin constitutes "merchandise" within the meaning of Minn. Stat. § 325F.68(2).

498.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

499.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that each Defendant's acts show deliberate disregard for the rights or safety of others.

## COUNT THIRTY-TWO

## VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT

## (MINN. STAT. § 325D.43-48, *ET SEQ.*)

500.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

501.     This claim is brought by Plaintiffs on behalf of residents of Minnesota who are members of the Class.

502.     The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."  Minn. Stat. § 325D.44.

503.     Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

504.     Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## COUNT THIRTY-THREE

## VIOLATION OF THE MISSISSIPPI CONSUMER PROTECTION ACT

## (MISS. CODE. ANN. § 75-24-1, *ET SEQ.*)

505.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

506.    This claim is brought by Plaintiffs on behalf of residents of Mississippi who are members of the Class.

507.    The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits "unfair or deceptive trade practices in or affecting commerce."  Miss. Code Ann. § 75-24-5(1).  Unfair or deceptive practices include, but are not limited to, "[m]isrepresentations of fact concerning the reasons for, existence of, or amounts of price reductions."  Miss. Code Ann. § 75-24-5(2).

508.    Plaintiffs seek actual damages in an amount to be determined at trial any other just and proper relief available under the Mississippi CPA.

## COUNT THIRTY-FOUR

## VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT

## (MO. REV. STAT. § 407.010, *ET SEQ.*)

509.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

510.    This claim is brought by Plaintiffs on behalf of residents of Missouri who are members of the Class.

511.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise."  Mo. Rev. Stat. § 407.020.

512.     Each Defendant, Plaintiffs, and class members are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

513.     Defendant engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

514.     Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining each Defendant's unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT THIRTY-FIVE

### VIOLATION OF THE MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT OF 1973

### (MONT. CODE ANN. § 30-14-101, *ET SEQ.*)

515.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

516.     This claim is brought by Plaintiffs on behalf of residents of Montana who are members of the Class.

517.     The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mont. Code Ann. § 30-14-103.

518.     Defendants, Plaintiffs, and class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

519.     Plaintiffs and class members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

520.    The sale of each drug at issue occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and each Defendant committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

521.    Because Defendants' unlawful methods, acts, and practices have caused Plaintiffs to suffer an ascertainable loss of money and property, Plaintiffs seek from each Defendant:  the greater of actual damages or $500; discretionary treble damages; reasonable attorneys' fees.

522.    Plaintiffs additionally seek an order enjoining each Defendant's unfair, unlawful, and/or deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

## COUNT THIRTY-SIX

## VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

## (NEB. REV. STAT. § 59-1601, *ET SEQ.*)

523.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

524.    This claim is brought by Plaintiffs on behalf of residents of Nebraska who are members of the Class.

525.    The Nebraska Consumer Protection Act ("Nebraska CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Neb. Rev. Stat. § 59-1602.

526.    Defendants, Plaintiffs, and class members are "person[s]" under Neb. Rev. Stat. § 59-1601(1).

527.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under Neb. Rev. Stat. § 59-1601(2).

528.    Because Defendants' conduct caused injury to Plaintiffs' property through violations of the Nebraska CPA, Plaintiffs seek recovery of actual damages, as well as enhanced

damages up to $1,000, an order enjoining each Defendant's unfair or deceptive acts and practices, costs of Court, reasonable attorneys' fees, and any other just and proper relief available under Neb. Rev. Stat. § 59-1609.

## COUNT THIRTY-SEVEN

## VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT

## (NEV. REV. STAT. § 598.0903, *ET SEQ*.)

529.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

530.     This claim is brought by Plaintiffs on behalf of residents of Nevada who are members of the Class.

531.     The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices.  Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person:  "[m]akes false or misleading statements of fact concerning the price of goods or services for sale or lease, or the reasons for, existence of or amounts of price reductions;" "[k]nowingly makes any other false representation in a transaction;" "[f]ails to disclose a material fact in connection with the sale or lease of goods or services;" or "[m]akes an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, unless, at the time the assertion is made, the person making it has possession of factually objective scientific, clinical or quantifiable evidence which substantiates the assertion."  Nev. Rev. Stat. §§ 598.0915–598.0925.

532.     Accordingly, Plaintiffs seek their actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA.  Nev. Rev. Stat. § 41.600.

010646-11 932598 V1

**COUNT THIRTY-EIGHT**

**VIOLATION OF THE NEW HAMPSHIRE
CONSUMER PROTECTION ACT**

**(N.H. REV. STAT. ANN. § 358-A:1, *ET SEQ.*)**

533.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

534.    This claim is brought by Plaintiffs on behalf of residents of New Hampshire who are members of the Class.

535.    The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person, in the conduct of any trade or commerce, from "using any unfair or deceptive act or practice," including, "but . . . not limited to" "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  N.H. Rev. Stat. Ann. § 358-A:2.

536.    Defendants, Plaintiffs, and class members are "persons" under N.H. Rev. Stat. Ann. § 358-A:1.

537.    Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

538.    Because Defendants' willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; an order enjoining each Defendant's unfair and/or deceptive acts and practices; and any other just and proper relief under N.H. Rev. Stat. Ann. § 358-A:10.

- 141 -

## COUNT THIRTY-NINE

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT

## (N.J. STAT. ANN. § 56:8-1, *ET SEQ.*)

539.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

540.    This claim is brought by Plaintiffs on behalf of residents of New Jersey who are members of the Class.

541.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.

542.    Defendants, Plaintiffs, and class members are "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

543.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

544.    Plaintiffs are entitled to recover legal and/or equitable relief, including an order enjoining Defendants' unlawful conduct, treble damages, costs, and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

010646-11 932598 V1

## COUNT FORTY

## VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT

## (N.M. STAT. ANN. §§ 57-12-1, *ET SEQ.*)

545.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

546.     This claim is brought by Plaintiffs on behalf of residents of New Mexico who are members of the Class.

547.     The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including, but not limited to, "failing to state a material fact if doing so deceives or tends to deceive."  N.M. Stat. Ann. § 57-12-2(D).

548.     Defendants, Plaintiffs, and class members are "person[s]" under N.M. Stat. Ann. § 57-12-2.

549.     Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

550.     Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, Plaintiffs seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; punitive damages; and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

# COUNT FORTY-ONE

## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW §§ 349-350

## (N.Y. GEN. BUS. LAW §§ 349-350)

551.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

552.     This claim is brought by Plaintiffs on behalf of residents of New York who are members of the Class.

553.     The New York General Business Law ("New York GBL") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."  N.Y. Gen. Bus. Law § 349.

554.     Plaintiffs and class members are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

555.     Each Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

556.     Defendants' deceptive acts and practices, which were intended to mislead consumers who purchased insulin, was conduct directed at consumers.

557.     Because Defendants' willful and knowing conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Defendants' deceptive conduct; and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT FORTY-TWO

## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT

## (N.C. GEN. STAT. § 75-1.1, *ET SEQ.*)

558.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

559.    This claim is brought by Plaintiffs on behalf of residents of North Carolina who are members of the Class.

560.    North Carolina's Unfair and Deceptive Acts and Practices Act (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

561.    Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

562.    Plaintiffs seek an order for treble their actual damages, an order enjoining Defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT FORTY-THREE

## VIOLATION OF THE NORTH DAKOTA CONSUMER FRAUD ACT

## (N.D. CENT. CODE § 51-15-02)

563.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

564.    This claim is brought by Plaintiffs on behalf of residents of North Dakota who are members of the Class.

565.     The North Dakota Consumer Fraud Act ("North Dakota CFA") makes unlawful "[t]he act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise…."  N.D. Cent. Code § 51-15-02.

566.     Defendants, Plaintiffs, and class members are "persons" within the meaning of N.D. Cent. Code § 51-15-02(4).

567.     Defendants' engaged in the "sale" of "merchandise" within the meaning of N.D. Cent. Code § 51-15-02(3), (5).

568.     Defendants knowingly committed the conduct described above, and thus, under N.D. Cent. Code § 51-15-09, Defendants are liable to Plaintiffs for treble damages in amounts to be proven at trial, as well as attorneys' fees, costs, and disbursements.  Plaintiffs further seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, and other just and proper available relief under the North Dakota CFA.

## COUNT FORTY-FOUR

## VIOLATION OF THE OHIO CONSUMER SALES PRACTICES ACT

## (OHIO REV. CODE ANN. § 1345.01, *ET SEQ.*)

569.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

570.     This claim is brought by Plaintiffs on behalf of residents of Ohio who are members of the Class.

571.     Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code Ann. § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction.  Specifically, and without limitation of the broad prohibition, the Act prohibits

suppliers from representing that "a specific price advantage exists, if it does not."  Ohio Rev. Code Ann. § 1345.02.

572.    Each Defendant is a "supplier" as that term is defined in Ohio Rev. Code Ann. § 1345.01(C).

573.    Plaintiffs and class members are "consumers" as that term is defined in Ohio Rev. Code Ann. § 1345.01(D), and their purchases of insulin is a "consumer transaction" within the meaning of Ohio Rev. Code Ann. § 1345.01(A).

574.    As a result of the foregoing wrongful conduct, Plaintiffs have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble damages, court costs, and reasonable attorneys' fees, pursuant to Ohio Rev. Code Ann. § 1345.09, *et seq.*

## COUNT FORTY-FIVE

## VIOLATION OF THE OKLAHOMA CONSUMER PROTECTION ACT

## (OKLA. STAT. TIT. 15, § 751, *ET SEQ.*)

575.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

576.    This claim is brought by Plaintiffs on behalf of residents of Oklahoma who are members of the Class.

577.    The Oklahoma Consumer Protection Act ("Oklahoma CPA") declares unlawful, *inter alia*, the following acts or practices when committed in the course of business:  making a "misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person;" "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers;" and making "false or misleading statements of fact, knowingly or with reason to know, concerning the price of the subject of a consumer transaction or the reason for, existence of, or amounts of price reduction."  Okla. Stat. tit. 15, §§ 752-753.

578.    Plaintiffs and class members are "persons" under Okla. Stat. tit. 15, § 752.

579.    Each Defendant is a "person," "corporation," or "association" within the meaning of Okla. Stat. tit. 15, § 15-751(1).

580.    The sale of insulin to Plaintiffs was a "consumer transaction" within the meaning of Okla. Stat. tit. 15, § 752, and each Defendant's actions as set forth herein occurred in the conduct of trade or commerce.

581.    Plaintiffs seek punitive damages because Defendants' conduct was egregious. Defendants misrepresented actual price of insulin, inflated the benchmark price, and concealed the reasons for and amount of the rebates offered to PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its life-saving product without regard to the impact of its scheme on consumers' ability to afford to buy a product necessary to sustain their life.  Defendants' egregious conduct warrants punitive damages.

582.    Defendants' conduct as alleged herein was unconscionable because (1) Defendants, knowingly or had reason to know, took advantage of consumers reasonably unable to protect their interests because of their age, physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor; (2) at the time the consumer transaction was entered into, Defendants knew or had reason to know that price the consumers were charged grossly exceeded the price at which similar products were readily obtainable in similar transactions by like consumers; and (3) Defendants knew or had reason to know that the

transaction Defendants induced the consumers to enter into was excessively one-sided in favor of each Defendant.

583.     Because Defendants' unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under Okla. Stat. tit. 15, § 761.1.  Plaintiffs further seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, and any other just and proper relief available under the Oklahoma CPA.

## COUNT FORTY-SIX

## VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT

## (OR. REV. STAT. §§ 646.605, *ET SEQ.*)

584.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

585.     This claim is brought by Plaintiffs on behalf of residents of Oregon who are members of the Class.

586.     The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following:  "[m]ak[ing] false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions;" "[m]ak[ing] false or misleading representations of fact concerning the offering price or, or the person's cost for . . . goods;" or "[e]ngag[ing] in any other unfair or deceptive conduct in trade or commerce."  Or. Rev. Stat. § 646.608(1).

587.     Each Defendant is a person within the meaning of Or. Rev. Stat. § 646.605(4).

588.     Each drug at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

- 149 -

589.     Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1).  Plaintiffs are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**COUNT FORTY-SEVEN**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW**

**(73 PA. CONS. STAT. § 201-1, *ET SEQ.*)**

590.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

591.     This claim is brought by Plaintiffs on behalf of residents of Pennsylvania who are members of the Class.

592.     The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:  "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."  73 Pa. Cons. Stat. § 201-2(4).

593.     Defendants, Plaintiffs, and class members are "persons" within the meaning of 73 Pa. Cons. Stat. § 201-2(2).

594.     Plaintiffs purchased insulin primarily for personal, family, or household purposes within the meaning of 73 Pa. Cons. Stat. § 201-9.2.

595.     All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 Pa. Cons. Stat. § 201-2(3).

596.     Defendants are liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs.  73 Pa. Cons. Stat. § 201-9.2(a).  Plaintiffs are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT FORTY-EIGHT

## VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

### (R.I. GEN. LAWS § 6-13.1, *ET SEQ.*)

597.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

598.     This claim is brought by Plaintiffs on behalf of residents of Rhode Island who are members of the Class.

599.     Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including:  "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" "[e]ngaging in any act or practice that is unfair or deceptive to the consumer;" and "[u]sing any other methods, acts or practices which mislead or deceive members of the public in a material respect."  R.I. Gen. Laws § 6-13.1-1(6).

600.     Defendants, Plaintiffs, and class members are "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

601.     Defendants were engaged in "trade" and "commerce" within the meaning of R.I. Gen. Laws § 6-13.1-1(5).

602.     Plaintiffs purchased insulin primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

603.     Plaintiffs are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages at the discretion of the Court.

## COUNT FORTY-NINE

## VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT

## (S.C. CODE ANN. § 39-5-10, *ET SEQ.*)

604.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

605.     This claim is brought by Plaintiffs on behalf of residents of South Carolina who are members of the Class.

606.     The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).

607.     Each Defendant is a "person" under S.C. Code Ann. § 39-5-10.

608.     Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses.  Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

609.     Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  Defendants misrepresented actual price of these drugs, inflated the benchmark price, and concealed the reasons for and amount of the rebates offered to

PBMs in order to increase its profits at the expense of consumers.  It manipulated the price of its

life-saving product without regard to the impact of its scheme on consumers' ability to afford to

buy a product necessary to sustain their life.  Defendants' unlawful conduct constitutes malice,

oppression, and fraud warranting punitive damages.

610.    Plaintiffs further seek an order enjoining each Defendant's unfair or deceptive

acts or practices.

### COUNT FIFTY

### VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW

### (S.D. CODIFIED LAWS § 37-24-6)

611.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by

reference the allegations contained in the preceding paragraphs of this complaint.

612.    This claim is brought by Plaintiffs on behalf of residents of South Dakota who are

members of the Class.

613.    The South Dakota Deceptive Trade Practices and Consumer Protection Law

("South Dakota CPL") prohibits deceptive acts or practices, which include "[k]nowingly

act[ing], us[ing], or employ[ing] any deceptive act or practice, fraud, false pretense, false

promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection

with the sale or advertisement of any merchandise, regardless of whether any person has in fact

been misled, deceived, or damaged thereby;" and "advertising price reductions without . . .

including in the advertisement the specific basis for the claim of a price reduction or [o]ffering

the merchandise for sale at the higher price from which the reduction is taken for at least seven

consecutive business days during the sixty-day period prior to the advertisement."  S.D. Codified

Laws §§ 37-24-6(1), 37-24-31.

614.    Under S.D. Codified Laws § 37-24-31, Plaintiffs are entitled to a recovery of their actual damages suffered as a result of Defendant's acts and practices.

## COUNT FIFTY-ONE

## VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT

## (TENN. CODE ANN. § 47-18-101, *ET SEQ.*)

615.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

616.    This claim is brought by Plaintiffs on behalf of residents of Tennessee who are members of the Class.

617.    Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including, but not limited to, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  Tenn. Code Ann. § 47-18-104.

618.    Plaintiffs and class members are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

619.    Each Defendant is a "person" within the meaning of Tenn. Code Ann. § 47-18-103(2).

620.    Each Defendant's conduct complained of herein affected "trade," "commerce," or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

621.    Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs seek monetary relief against each Defendant measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

## COUNT FIFTY-TWO

## VIOLATION OF THE TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT

## (TEX. BUS. & COM. CODE §§ 17.41, *ET SEQ.*)

622.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

623.    This claim is brought by Plaintiffs on behalf of residents of Texas who are members of the Class.

624.    On January 24, 2017, and January 25, 2017, Plaintiffs sent letters complying with Tex. Bus. & Com. Code § 17.505(a).  Plaintiffs will add Texas DTPA claims on or before March 25, 2017.

## COUNT FIFTY-THREE

## VIOLATION OF THE UTAH CONSUMER SALE PRACTICES ACT

## (UTAH CODE ANN. § 13-11-1, *ET SEQ.*)

625.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

626.    This claim is brought by Plaintiffs on behalf of residents of Utah who are members of the Class.

627.    The Utah Consumer Sales Practices Act ("Utah CSPA") makes unlawful any "deceptive act or practice by a supplier in connection with a consumer transaction," including, but not limited to, "indicat[ing] that a specific price advantage exists, if it does not."  Utah Code Ann. § 13-11-4.  "An unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the Utah CSPA.  Utah Code Ann. § 13-11-5.

628.     Defendants knew, or had reason to know, that consumers would rely on Defendants' reported benchmark price as the price of insulin, and knew that, given the real benchmark price spread that Defendants had created, the insulin benchmark price was not a fair or reasonable approximation of the actual cost of insulin.  Defendants therefore engaged in an unconscionable act within the meaning of Utah Code Ann. § 13-11-5.

629.     Pursuant to Utah Code Ann. § 13-11-4, Plaintiffs seek monetary relief measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $2,000 for each Plaintiff; reasonable attorneys' fees; and any other just and proper relief available under the Utah CSPA.

## COUNT FIFTY-FOUR

## VIOLATION OF THE VERMONT CONSUMER FRAUD ACT

## (VT. STAT. ANN. TIT. 9, § 2451 *ET SEQ.*)

630.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

631.     This claim is brought by Plaintiffs on behalf of residents of Vermont who are members of the Class.

632.     The Vermont Consumer Fraud Act ("Vermont CFA") makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce.…" Vt. Stat. Ann. tit. 9, § 2453(a).

633.     Defendants were sellers within the meaning of Vt. Stat. Ann. tit. 9, § 2451(a)(c).

634.     Plaintiffs are entitled to recover "appropriate equitable relief" and "the amount of [their] damages, or the consideration or the value of the consideration given by [them], reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by [them]," pursuant to Vt. Stat. Ann. tit. 9, § 2461(b).

# COUNT FIFTY-FIVE

## VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT

## (VA. CODE ANN. §§ 59.1-196, *ET SEQ.*)

635.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

636.     This claim is brought by Plaintiffs on behalf of residents of Virginia who are members of the Class.

637.     The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include:  "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."  Va. Code Ann. § 59.1-200.

638.     Each Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

639.     Defendants' advertisement of the insulin benchmark price was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

640.     Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each plaintiff, the greater of (a) three times actual damages or (b) $1,000.

641.     Plaintiffs also seek an order enjoining each Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Va. Code Ann. § 59.1-204, *et seq.*

## COUNT FIFTY-SIX

## VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT

## (WASH. REV. CODE ANN. §§ 19.86.010, *ET SEQ.*)

642.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

643.     This claim is brought by Plaintiffs on behalf of residents of Washington who are members of the Class.

644.     The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code. Ann. § 19.96.010.

645.     Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code. Ann. § 19.96.010.

646.     Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

## COUNT FIFTY-SEVEN

## VIOLATION OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT

## (W. VA. CODE § 46A-1-101, *ET SEQ.*)

647.     The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

648.     This claim is brought by Plaintiffs on behalf of residents of West Virginia who are members of the Class.

649.    On January 24, 2017, and January 25, 2017, Plaintiffs sent letters complying with W. Va. Code § 46A-6-106(b).  If Defendants fail to remedy their unlawful conduct within the requisite time period, Plaintiffs will seek all damages and relief to which Plaintiffs are entitled.

## COUNT FIFTY-EIGHT

## VIOLATION OF THE WISCONSIN DECEPTIVE TRADE PRACTICES ACT

## (WIS. STAT. § 110.18)

650.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

651.    This claim is brought by Plaintiffs on behalf of residents of Wisconsin who are members of the Class.

652.    The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits a "representation or statement of fact which is untrue, deceptive or misleading."  Wis. Stat. § 100.18(1).

653.    Each Defendant is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

654.    Plaintiffs and class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1).  Plaintiffs purchased insulin.

655.    Plaintiffs are entitled to damages and other relief provided for under Wis. Stat. § 100.18(11)(b)(2).  Because Defendants' conduct was committed knowingly and/or intentionally, Plaintiffs are entitled to treble damages.

656.    Plaintiffs also seek court costs and attorneys' fees under Wis. Stat. § 110.18(11)(b)(2).

010646-11  932598 V1

## COUNT FIFTY-NINE

## VIOLATION OF THE WYOMING CONSUMER PROTECTION ACT
### (WYO. STAT. §§ 40-12-105 *ET SEQ.*)

657.    The Sanofi, Novo Nordisk, and Eli Lilly Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

658.    This claim is brought by Plaintiffs on behalf of residents of Wyoming who are members of the Class.

659.    On January 24, 2017 an January 25, 2017, Plaintiffs sent letters complying with Wyo. Stat. §§ 45-12-109.  If Defendants fail to remedy their unlawful conduct, Plaintiffs will seek all damages and relief to which Plaintiffs are entitled.

660.    Pursuant to applicable state statutes, Plaintiffs will mail a copy of this action to the Attorney General's office for the states of Connecticut, Illinois, Louisiana, Missouri, New Jersey, Oregon, Texas, Utah, and Washington.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed class, respectfully demand that this Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the class, and declare Plaintiffs as the representative of the class;

B.    Enter judgments against Defendants and in favor of Plaintiffs and the class;

C.    Award the class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

D.      Award Plaintiffs and the class their costs of suit, including reasonable attorneys'

fees as provided by law; and

E.      Award such further and additional relief as the case may require and the Court

may deem just and proper under the circumstances.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs, on behalf of themselves and the proposed class,

demand a trial by jury on all issues so triable.

Dated: January 30, 2017

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By  */s/ Thomas M. Sobol*
    Thomas M. Sobol (BBON # 471770)
    Hannah Brennan (BBON # 688179)
55 Cambridge Parkway, Suite 301
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617)482-3003
tom@hbsslaw.com
hannahb@hbsslaw.com

Steve W. Berman (*pro hac vice pending*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Attorneys for Plaintiffs*

- 162 -

010646-11  932598 V1